# EXHIBIT I


**FDIC**

550 17th St. NW Washington DC, 20429                                    Legal Division

Date: _September 13_, 2010

Re: FOIA Request No. _10-1479_

Dear FOIA Requester:

Thank you for your recent correspondence requesting information about a loan transaction involving yourself and an FDIC-insured financial institution subsequently ordered into FDIC receivership.

Please be certain that you have provided us with the complete address and/or name of the property (e.g. "Southfork Ranch") as well as any other identifying information regarding your loan.

To ensure your privacy, the FDIC's regulations provide that requests by individuals for access to records pertaining to them *must include appropriate proof of identity.* To establish proof of your identity, you must send us either (1) a certification of a duly commissioned notary public, of any state or territory, attesting to your identity, or (2) an unsworn declaration subscribed to as true under the penalty of perjury under the laws of the United States of America. *In addition, you must attach a copy of a photo ID such as a drivers license.*

For your convenience, if you choose to send an unsworn declaration instead of a notarized certification, we are providing the following example:

> **I, [** _insert your name here_ **] hereby declare and affirm under the penalty of perjury under the laws of the United States of American that I am the person making this request. In witness whereof, I have signed and dated my request.**
>
> **Signature** (*Legible and Original*): [_____ _sign here_ _____] Date: [ _insert date here_ ]

If you wish, you may fax this information to us at **703-562-2797**. If we do not hear from you within ten (10) calendar days from the date of this letter, we will conclude that you no longer wish to pursue this matter and we will close your request.

Finally, please keep in mind that the FDIC often sells the loan assets of failed financial institutions in receivership and the loan file is transferred to the purchaser. Consequently, the information that you wish to obtain may not be available from the FDIC.

**If you have questions, please contact FDIC Counsel John Elmore at 703-562-2047.**

Sincerely,

FDIC FOIA and Privacy Act Group

# FDIC

**Federal Deposit Insurance Corporation**
550 17th Street NW, Washington, D.C. 20429-9990

Legal Division

*9-23-70*

September 13, 2010 — ~~delete~~ *received til 9-20-10* → *Please Not change of address*

~~DIANE J. BEALL~~

*FKA* Diane Templin
~~c/o 1016 Circle Drive~~   *243 S. ESCONDIDO BLVD*
Escondido, CA  92025   *# 125*
*ESCONDIDO, CA 92025*

Re:  IndyMac Loan: 1003561436   *FOIA REQUEST # -10-1479*

Dear FOIA Requester:

Your Freedom of Information Act/Privacy Act request dated **August 31, 2010,** has been received by the FDIC Freedom of Information/Privacy Act Group on **September 13, 2010,** and has been assigned Log Number **10-1479.**

Please be advised that the FOIA allows up to 20 <u>business</u> days, from date of receipt, to process your request, and additional processing time is allowed under certain circumstances.   Complete information about the FOIA process at the FDIC is available at http://www.fdic.gov/about/freedom/guide.html.

The Freedom of Information (FOIA) Specialist assigned to your file will contact you, as necessary.  Please cite your FOIA Log number in any future inquiries regarding your request. You may also call FDIC's FOIA Service Center at 202-898-7021 to obtain information about the FOIA process and the status of your request.

Sincerely,   *Property is 16377 ARNOLD AVE LAKE ELSINORE, CA 92830*

The FDIC FOIA/Privacy Group

*I Diane Joan Beall FKA Diane Templin hereby declare & affirm under penalty of perjury under the laws of the ~~State of~~ DB FKA DT United States of America that I am the person making this request. In witness whereof, I have signed ~~my~~ & dated my request. Diane J. Beall FKA Diane Templin Date 9-23-10   DIANE J BEALL fka TEMPLIN*

I certify that is is my current ID but I have an address change of

243 S Escondido Blvd #175 Escondido, CA 92025

Dated 9-23-10

DIANE JOAN BEALL
   FKA
DIANE BEALL TEMPLIN
   AKA
DIANE TEMPLIN)

Diane Joan Beall
   fka
Diane Beall Templin
   aka
Diane Templin

**CALIFORNIA**
DRIVER LICENSE
N8715100                     CLASS: C
EXPIRES 05-23-14

DIANE JOAN BEALL
1026 CIRCLE DR
ESCONDIDO CA 92025
SEX: F     HAIR: BRN     EYES: BRN
HT: 5-03   WT: 115       DOB: 05-23-47
RSTR: CORR LENS

01/13/2010

**2010**
THE STATE BAR OF CALIFORNIA

**DIANE BEALL TEMPLIN**
86877               **MCLE GROUP 3**

PRESERVE AND IMPROVE OUR JUSTICE SYSTEM
IN ORDER TO ASSURE A FREE AND JUST SOCIETY UNDER LAW.
Only active members are entitled to practice law.

**ACTIVE**                Executive Director / Secretary

State of California, County of San Diego
Subscribed and sworn to (or affirmed) before
me on this 24 day of Sept 2010,
by DIANE JOAN BEALL
proved to me on the basis of satisfactory
evidence to be the person(s) who appeared
before me.



LEON CHEBAT
Commission # 1715813
Notary Public - California
San Diego County
My Comm. Expires Feb 9, 2011

# FDIC

**Federal Deposit Insurance Corporation**
550 17th St. NW Washington DC, 20429

Legal Division

September 28, 2010

Ms. Diane J. Beall
243 S. Escondido Blvd. #125
Escondido, CA 92025

### FDIC FOIA Log No. 10-1479

Dear Ms. Beall:

This will respond to your Freedom of Information Act ("FOIA") request.

Enclosed are copies of the following records located by the FDIC which appear to be responsive to your request:

1. Servicing Business Asset Purchase Agreement
2. Excerpt of Schedule 1.01(a) Mortgage Loans to Servicing Business Asset Purchase Agreement

These documents reflect that the servicing of the loan described in your FOIA request was transferred to OneWest Bank, FSB. Consequently, questions concerning this loan should be addressed to OneWest Bank, FSB. The main office of the bank is located at 888 E Walnut Street, Pasadena, California 91101. Additional information on contacting the bank may be found at: https://www.owb.com/Contact-Us/.

Lastly, please note that the Freedom of Information Act does not obligate agencies to answer questions such as those raised in your FOIA request.

This completes the processing of your request.

Sincerely,

John K. Elmore
Counsel
FOIA/Privacy Act Group
Tel: 703-562-2047
Fax: 703-562-2797
Email: JoElmore@FDIC.gov

Enclosures

**Execution Copy**

# SERVICING BUSINESS ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

## THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB

## AND

## ONEWEST BANK, FSB

## Dated as of March 19, 2009

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND CONSTRUCTION..................................................................2

    Section 1.01 Definitions ..........................................................................................................2
    Section 1.02 Construction......................................................................................................12

ARTICLE II THE PURCHASE AND SALE...............................................................................13

    Section 2.01 Purchase and Sale of Assets .............................................................................13
    Section 2.02 Excluded Assets................................................................................................14
    Section 2.03 Assumption of Liabilities .................................................................................14
    Section 2.04 Excluded Liabilities..........................................................................................15
    Section 2.05 Retained Claims and Release ............................................................................16
    Section 2.06 Purchase Price; Closing Payment......................................................................17
    Section 2.07 Prorations..........................................................................................................18
    Section 2.08 Closing..............................................................................................................18
    Section 2.09 Closing Procedure.............................................................................................18
    Section 2.10 Closing Adjustment Documents........................................................................18
    Section 2.11 Calculation of Adjustments ..............................................................................18
    Section 2.12 Final Settlement................................................................................................19
    Section 2.13 Release of the Advance Holdback Amount........................................................19
    Section 2.14 Servicing Adjustment .......................................................................................19

ARTICLE III PRE-CLOSING COVENANTS ............................................................................20

    Section 3.01 Transition..........................................................................................................20
    Section 3.02 Employees ........................................................................................................21
    Section 3.03 Agency Approvals; Qualification to Act as Servicer .........................................21
    Section 3.04 Additional Title Documents ..............................................................................21

ARTICLE IV CLOSING DELIVERIES ....................................................................................21

    Section 4.01 Seller's Deliverables.........................................................................................21
    Section 4.02 Purchaser's Deliverables ..................................................................................22

ARTICLE V TRANSFER OF MORTGAGE RELATED ASSETS.............................................22

    Section 5.01 Transfer of Documents, etc ..............................................................................22
    Section 5.02 Unremitted Collections; Escrow Accounts and Custodial Accounts .................22
    Section 5.03 Invoices............................................................................................................23
    Section 5.04 Notice to Mortgagors........................................................................................23
    Section 5.05 Forwarding Post-Closing Date Items ...............................................................23
    Section 5.06 Misapplied and Returned Payments ..................................................................23
    Section 5.07 Notice to Insurers, Tax Authorities and Bankruptcy Trustees ...........................24
    Section 5.08 Tax and Flood Contracts...................................................................................24
    Section 5.09 Custodial Agreements.......................................................................................24
    Section 5.10 Servicing of REO Property................................................................................24
    Section 5.11 MERS Mortgage Loans.....................................................................................25

Section 5.12 GLBA ...........................................................................................................25
Section 5.13 Mortgage Loans in Litigation .....................................................................25
Section 5.14 Mortgage Loans in Bankruptcy ..................................................................26
Section 5.15 Retained Claims...........................................................................................27

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF THE PURCHASER...............27

ARTICLE VII REPRESENTATIONS AND WARRANTIES; ASSET-LEVEL
        STATEMENTS.....................................................................................................27

Section 7.01 Assets Conveyed "AS IS"; Purchaser Acknowledgments .................................27
Section 7.02 Representations and Warranties of the Seller.....................................................28
Section 7.03 Asset-Level Statements .....................................................................................28

ARTICLE VIII REMEDIES FOR DEFECTIVE ASSETS............................................................29

Section 8.01 Remedy.....................................................................................................29
Section 8.02 Conditions Precedent to Remedy .......................................................................30
Section 8.03 Excluded Losses .................................................................................................30
Section 8.04 Third Party Claims..............................................................................................31
Section 8.05 Notice and Evidence of Defect...........................................................................31
Section 8.06 Processing of the Remedy Request ....................................................................32
Section 8.07 Seller Loss Limit ................................................................................................33

ARTICLE IX CONDITIONS PRECEDENT TO CLOSING ........................................................33

Section 9.01 Conditions to Purchaser's Obligation................................................................33
Section 9.02 Conditions to Seller's Obligation. .....................................................................33

ARTICLE X POST-CLOSING COVENANTS .............................................................................33

Section 10.01    Discharge of Liabilities.................................................................................33
Section 10.02    Performance of Servicing .............................................................................33
Section 10.03    Standard of Care ...........................................................................................34
Section 10.04    Mitigation of Losses .....................................................................................34
Section 10.05    Reimbursement of Recoveries ......................................................................34
Section 10.06    Reimbursement for Draws ............................................................................35
Section 10.07    Tax Reporting ................................................................................................35
Section 10.08    Insured or Guaranteed Mortgage Loans .......................................................35
Section 10.09    Notice of Claim.............................................................................................35
Section 10.10    Prior Servicer Information .............................................................................35
Section 10.11    Further Assurances; Post-Closing Cooperation ............................................36
Section 10.12    Loan Modification Program...........................................................................36
Section 10.13    Information and Access for Bond Insurers ....................................................37

ARTICLE XI TAX MATTERS.......................................................................................................37

Section 11.01    Responsibility for Filing Tax Returns...........................................................37
Section 11.02    Refund and Tax Benefits. ..............................................................................37
Section 11.03    Cooperation on Tax Matters. .........................................................................37

Schedules:

| | |
|---|---|
| Schedule 1.01(a) | Mortgage Loans |
| Schedule 1.01(b) | Servicing Agreement Transactions |
| Schedule 2.01(b) | Servicing Advances |
| Schedule 2.01(c) | Servicing Fee Receivables |
| Schedule 2.01(f) | Escrow Accounts |
| Schedule 2.03(c) | Assumed Litigation |
| Schedule 2.06 | Categories and Applicable Percentages with Respect to Servicing Rights |
| Schedule 7.03(f) | Servicing Agreements |

Exhibits:

| | |
|---|---|
| Exhibit A | Form of Affidavit and Assignment of Claim |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Term Sheet for Assignment of Funding Obligations to Servicer in HELOC Securitizations and Reimbursement for Draws |
| Exhibit D | Form of Bill of Sale |
| Exhibit E | Form of Limited Power of Attorney |
| Exhibit F | FDIC's Mortgage Loan Modification Program |
| Exhibit G | Affidavit of Lost Certificate |

## SERVICING BUSINESS ASSET PURCHASE AGREEMENT

THIS SERVICING BUSINESS ASSET PURCHASE AGREEMENT (as the same shall be amended or supplemented, this "**Agreement**") is made and entered into as of the 19th day of March, 2009 by and between THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB (the "**Seller**") and ONEWEST BANK, FSB (the "**Purchaser**").

### RECITALS

WHEREAS, on July 11, 2008, the FDIC (as defined below) was appointed Receiver for IndyMac Bank, FSB (the "**Failed Thrift**") and certain assets and obligations of the Failed Thrift were transferred to a newly-formed thrift, IndyMac Federal Bank, FSB ("**IndyMac Federal**"), for which the FDIC was appointed Conservator (the "**Conservator**"), and on the date hereof, the FDIC was appointed Receiver for IndyMac Federal (the "**Receiver**");

WHEREAS, under the Federal Deposit Insurance Act, as amended, the FDIC is authorized to sell or otherwise dispose of the assets of thrift institutions for which it serves as conservator or receiver;

WHEREAS, IndyMac Federal, among other things, engaged in the business of servicing mortgage loans with primary operations in Austin, Texas, Kalamazoo, Michigan and Kansas City, Missouri (the "**Business**");

WHEREAS, IMB HoldCo LLC ("**HoldCo**") has agreed to purchase certain specified assets and assume certain specified liabilities of IndyMac Federal on the terms and subject to the conditions set forth herein and in the Master Purchase Agreement (as defined below);

WHEREAS, in order to facilitate the transactions provided for herein, HoldCo formed the Purchaser as a new federally-chartered insured savings bank, all of the stock of which will be acquired by OneWest Bank Group LLC, a newly-formed direct wholly-owned subsidiary of HoldCo;

WHEREAS, pursuant to this Agreement, the Seller shall sell, assign, convey and transfer to the Purchaser certain specified assets and certain specified liabilities of the Seller related to the Business; and

WHEREAS, the parties desire to memorialize their agreements relating to the transactions described above and certain other matters as set forth in this Agreement and the Master Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows.

## ARTICLE I

### DEFINITIONS AND CONSTRUCTION

Section 1.01    Definitions.  For purposes of this Agreement, the following terms shall have the meanings and definitions hereinafter respectively set forth:

"**Accounting Records**" means the general ledger, supporting subsidiary ledgers and schedules, and loan servicing system records of the Seller.

"**Acquired Subsidiary**" means IndyMac Financial Services, a California corporation and wholly owned subsidiary of IndyMac Federal.

"**Adjustment Date**" means, as to each Mortgage Loan, the date on which the Mortgage Interest Rate is adjusted in accordance with the terms of the related Mortgage Note and Mortgage.

"**Advance Holdback Amount**" has the meaning given in Section 2.11.

"**Advance Holdback Calculation Date**" means the date that is eighteen months after the Closing Date.

"**Advance Holdback Settlement Date**" means the date that is fifteen (15) Business Days after the Advance Holdback Calculation Date.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. For purposes of this definition, the term "**control**" (including the phrases "**controlled by**" and "**under common control with**") when used with respect to any specified Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or interests, by contract or otherwise.

"**Agency**" means the FHA, the FMHA (now RHCDS), Fannie Mae, Freddie Mac, Ginnie Mae, the VA, RHS or a State Agency, as applicable.

"**Agreement**" has the meaning given in the preamble, and shall include all exhibits, schedules and attachments hereto.

"**Ancillary Documents**" means the Master Purchase Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Guaranty and any and all other agreements and instruments that may be executed and delivered by the parties in connection with the transactions contemplated by this Agreement, and, upon execution thereof, the definitive agreements executed pursuant to the Term Sheet for Assignment of Funding Obligations to Servicer in HELOC Securitizations and Reimbursement for Draws attached as Exhibit C.

"**Asset-Level Statements**" has the meaning given in Section 7.01(b).

"**Assets**" has the meaning given in <u>Section 2.01</u>.

"**Affidavit and Assignment of Claim**" means an Affidavit and Assignment of Claim in the form of <u>Exhibit A</u> hereto.

"**Affidavit of Lost Certificate**" means an Affidavit of Lost Stock Certificate in the form of <u>Exhibit G</u> hereto.

"**Assignment and Assumption Agreement**" means an Assignment and Assumption Agreement in the form of <u>Exhibit B</u> hereto.

"**Assumed Liabilities**" has the meaning given in <u>Section 2.03</u>.

"**Bankruptcy Rule**" means the rules set forth under the Federal Rules of Bankruptcy Procedure, as the same may be amended from time to time.

"**Bill of Sale**" means a Bill of Sale in the form of <u>Exhibit D</u> hereto.

"**Bond Insurer**" means any insurer obligated to make payments to the related certificate holders in the event of a payment default in respect of any class of certificates in a Securitization Transaction.

"**Book Value**" means, with respect to any asset purchased or liability assumed by the Purchaser pursuant to this Agreement, the dollar amount thereof stated on the Accounting Records of the Seller, as of the applicable date, determined after adjustments made by the Seller for differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary. Without limiting the generality of the foregoing, the Book Value of an Assumed Liability shall include all accrued and unpaid interest thereon. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of the Seller.

"**Business**" has the meaning given in the recitals.

"**Business Day**" means any day except a Saturday, Sunday or other day on which federal savings banks in California, New York or Washington, D.C. or United States federal government offices are required or authorized by Law to close.

"**Change Fee**" means a fee charged to a Mortgagor for a change in the terms of the Mortgagor's Mortgage Loan.

"**Claims Termination Date**" means the first Business Day after the second anniversary of the Closing Date.

"**Closing**" has the meaning given in <u>Section 2.08</u>.

"**Closing Adjustment Documents**" has the meaning given in <u>Section 2.10</u>.

3

"**Closing Date**" means the date on which the Closing occurs.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral Document**" means any pledge agreement, security agreement, personal or corporate guaranty, deed of trust, deed, mortgage, contract for the sale of real property, assignment, collateral agreement or other agreement or document of any kind, whether an original or a copy, whether similar to or different from those enumerated, securing in any manner the performance or payment by any Mortgagor of its obligations or the obligations of any other Mortgagor under any of the Mortgage Loans or the Mortgage Notes evidencing the Mortgage Loans.

"**Conservator**" has the meaning given in the recitals.

"**Contract**" means any written agreement, lease (other than for real property), license or sublicense, evidence of indebtedness, or other written contract, commitment, arrangement or obligation, excluding Mortgage Loan Documents.

"**Custodial Account**" means an account maintained by the Seller or its agent for the deposit of principal and interest payments received in respect of one or more Mortgage Loans.

"**Data Processing Equipment**" means data processing equipment and related hardware and software, and shall include all equipment related thereto, including remote terminals, networked personal computers, cabling, writing and related installation equipment and materials.

"**Defect**" means the failure of any Asset-Level Statement to be true as of the Closing Date.

"**Defect Notice**" has the meaning given in Section 8.05.

"**Defective Asset**" has the meaning given in Section 8.01.

"**Disagreement**" has the meaning given in the Master Purchase Agreement.

"**Draws**" means with respect to a home equity line of credit, an additional borrowing by the related Mortgagor subsequent to the Closing Date in accordance with the related Mortgage Loan Documents.

"**Employee Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA, and each other employment, severance, consulting, deferred compensation, incentive compensation, fringe benefit, change in control, retention, stock option or other equity or equity-based or other compensatory or benefit plan, policy, agreement or arrangement (including any collective bargaining agreement, multiemployer, multiple employer or post retirement benefit plan), in all cases whether or not subject to ERISA, whether formal or informal, oral or written, legally binding or not, that is or was (i) maintained, administered, contributed to or required to be contributed to by the Seller, the Failed Thrift, IndyMac Federal or any of their respective ERISA Affiliates, or to which the Seller, the Failed Thrift, IndyMac Federal or any of their respective ERISA Affiliates is or was a party or had or has any present or future liability thereunder (except

4

as custodian, trustee, fiduciary or service provider to a customer plan), and (ii) is or was for the benefit of employees, directors or consultants who perform or previously performed services for the Seller, the Failed Thrift, IndyMac Federal or any of their respective Affiliates or who otherwise have a present or future right to benefits in respect of such services.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that, together with the Seller, the Failed Thrift or IndyMac Federal would be treated as a single employer under Section 414 of the Code.

"**Escrow Account**" means an account maintained by the Seller or its agent for the deposit of Escrow Payments received in respect of one or more Mortgage Loans.

"**Escrow Payments**" means the amounts constituting ground rents, taxes, assessments, water rates, common charges in condominiums and planned unit developments, mortgage insurance premiums, fire and hazard insurance premiums and other payments which have been escrowed by the Mortgagor with the Seller or its agent pursuant to any Mortgage Loan.

"**Excluded Assets**" has the meaning given in the Master Purchase Agreement.

"**Excluded Contracts**" has the meaning given in the Master Purchase Agreement.

"**Excluded Liabilities**" means, collectively, all liabilities of the Seller other than the Assumed Liabilities.

"**Excluded Losses**" means any consequential, special or indirect damages, lost profits, lost investment or business opportunity, interest, damages to reputation, punitive damages, exemplary damages, treble damages, nominal damages and operating losses.

"**Excluded Servicing Rights**" has the meaning given in Section 2.14(a).

"**Failed Thrift**" has the meaning given in the recitals.

"**Fair Market Value**" means the fair market value of an asset or a group of assets as set forth in an appraisal prepared prior to the Closing Date by Industrial Appraisal Company.

"**Fannie Mae**" means the Federal National Mortgage Association, or any successor thereto.

"**FDIC**" means the Federal Deposit Insurance Corporation in any capacity.

"**FHA**" means the Federal Housing Administration, an agency within the United States Department of Housing and Urban Development, or any successor thereto and including the Federal Housing Commissioner and the Secretary of Housing and Urban Development where appropriate under the FHA regulations.

"**Foreign Jurisdiction**" means any jurisdiction, other than the United States, and any subdivision of or in such other jurisdiction.

"**FMHA**" means the Farmers Home Administration, now known as RHCDS, or Rural Housing and Community Development Services, or any successor thereto.

"**Freddie Mac**" means the Federal Home Loan Mortgage Corporation, or any successor thereto.

"**GAAP**" means the United States generally accepted accounting principles as in effect from time to time.

"**Ginnie Mae**" means the Government National Mortgage Association, or any successor thereto.

"**GLBA**" has the meaning given in Section 5.12.

"**Governmental Authority**" means any United States or non-United States national, federal, state, local, municipal or provincial or international government or any political subdivision of any governmental, regulatory or administrative authority, agency or commission, or judicial or arbitral body.

"**Gross Margin**" means, with respect to each Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which is added to the Index in order to determine the related Mortgage Interest Rate, as set forth in the Mortgage Loan Schedule.

"**Group 2 Closing Payment**" has the meaning given in Section 2.06(b).

"**Group 2 Final Payment**" has the meaning given in Section 2.11(b).

"**Group 2 Final Purchase Price**" has the meaning given in Section 2.06(a).

"**GSE Mortgage Loans**" has the meaning given in Section 2.03(b).

"**Guaranty**" means the Guaranty Agreement, dated as of March 18, 2009, by and among the FDIC, in its corporate capacity, HoldCo and each other Beneficiary (as defined therein) that executes a joinder thereto.

"**Guidelines**" means the Statement on Loss Mitigation Strategies for Servicers of Residential Mortgages (September 2007), issued by the federal financial institutions regulatory agencies and the Conference of State Bank Supervisors, the Statement on Working with Mortgage Borrowers (April 2007), issued by the federal financial institutions regulatory agencies, and the Program, each as may be amended from time to time.

"**HELOC**" means home equity line of credit.

"**Holdback Settlement Payment**" has the meaning given in Section 2.13(b).

"**HoldCo**" has the meaning given in the preamble.

"**HUD**" means the United States Department of Housing and Urban Development, or any federal agency or official thereof which may from time to time succeed to the functions thereof

with regard to FHA mortgage insurance. The term "HUD," for purposes of this Agreement, is also deemed to include subdivisions thereof such as the FHA and Ginnie Mae.

"**Index**" means, with respect to any Mortgage Loan, the index set forth in the related Mortgage Note for the purpose of calculating interest therein.

"**IndyMac Federal**" has the meaning given in the recitals.

"**Initial Calculation Date**" means the close of business on January 31, 2009.

"**Insurer**" means any Person who insures or guarantees (i) all or any portion of the risk of loss upon the Mortgagor's default on any of the Mortgage Notes and (ii) against hazard, flood, earthquake, title or other risk of loss in accordance with (a) the Investor Requirements, (b) the related Trust Documents with respect to any Mortgage Loan or (c) the Mortgage.

"**Investor**" means (i) any Person (including an Agency) having a beneficial interest in a Mortgage Loan, or (ii) the trust in connection with a Securitization Transaction, as applicable.

"**Investor Requirements**" means all responsibilities and obligations established or promulgated by a Security Party.

"**Law**" means any applicable statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order (including any executive order) of any Governmental Authority.

"**Lien**" means any mortgage, pledge, security interest, equity interest, participation interest, lien or other charge or encumbrance, including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"**Limited Power of Attorney**" means a Limited Power of Attorney in the form of Exhibit E attached hereto.

"**Loss Limit**" has the meaning given in Section 8.07.

"**Losses**" means actual losses, damages, liabilities, costs and expenses (including, reasonable attorneys' fees and litigation and similar costs, and other out-of-pocket expenses incurred in investigating, defending, asserting or preparing the defense or assertion of any of the foregoing), deficiencies, claims, interest, awards, judgments, penalties and fines; provided that, unless expressly stated otherwise herein, Losses shall not include Excluded Losses.

"**Master Purchase Agreement**" means the Master Purchase Agreement, dated as of March 18, 2009, by and among the Conservator (and, on the date hereof, following the appointment of the FDIC as receiver for IndyMac Federal, the Receiver by joinder as of the date hereof), IMB HoldCo LLC, OneWest Bank Group LLC and the Purchaser (by joinder as of the date hereof).

"**Master Servicer**" means, with respect to any Securitization Transaction, the "master servicer," if any, identified in the related transaction documents.

"**MERS**" means Mortgage Electronic Registration Systems, Incorporated.

"**MERS® System**" means the MERSCORP, Inc. mortgage electronic registry system.

"**Monthly Payment**" means, with respect to any Mortgage Loan, the scheduled monthly payment of principal and interest on such Mortgage Loan which is payable by the related Mortgagor from time to time under the related Mortgage Note.

"**Mortgage**" means, with respect to a Mortgage Loan, a mortgage, deed of trust or other security instrument creating a Lien upon real property and any other property described therein which secures a Mortgage Note, together with any assignment, reinstatement, extension, endorsement or modification of any thereof.

"**Mortgage File**" means all documents pertaining to any Mortgage Loan, either copies or originals, that are in the possession of the Seller or any of its employees or contractors responsible for the servicing of the Mortgage Loan, other than (i) the original Mortgage Note, renewals of the Mortgage Note and Collateral Documents and (ii) confidential or privileged communications between the Seller (or any predecessor-in-interest, including the Failed Thrift) and its legal counsel; provided, however, that the Mortgage Files do not include files maintained by other employees or agents of the Seller, or attorney-client or work product privileged materials held by the Seller's legal counsel, unless in the opinion of such counsel, the disclosure of the material is not likely to result in the waiver of the attorney-client or work product privilege.

"**Mortgage Interest Rate**" means, with respect to each fixed rate Mortgage Loan, the fixed annual rate of interest provided for in the related Mortgage Note and, with respect to each adjustable rate Mortgage Loan, the annual rate at which interest accrues and adjusts in accordance with the provisions of the related Mortgage Note.

"**Mortgage Loan**" means a fixed or adjustable rate residential or commercial mortgage loan or home equity line of credit listed on the Mortgage Loan Schedule with respect to which the Seller owns only the related Servicing Rights and not the loan itself.

"**Mortgage Loan Documents**" means the documents in the Mortgage File.

"**Mortgage Loan Schedule**" means the schedule of Mortgage Loans attached as Schedule 1.01(a) (and delivered in electronic format to the Purchaser), which shall be updated as of the Closing Date pursuant to Section 2.10. The Mortgage Loan Schedule shall contain the following fields of information:

   (1)    the Mortgage Loan number;

   (2)    the address, city, state and zip code of the Mortgaged Property;

   (3)    the current Mortgage Interest Rate;

   (4)    the current Monthly Payment;

   (5)    the original term to maturity;

   (6)    the scheduled maturity date;

(7)     the unpaid principal balance of the Mortgage Loan;

(8)     the Gross Margin, if applicable;

(9)     the next Adjustment Date, if applicable;

(10)    paid through date or due date;

(11)    monthly Servicing Fee.

"**Mortgage Note**" means, with respect to a Mortgage Loan, a promissory note or notes, or other evidence of indebtedness, with respect to such Mortgage Loan secured by a Mortgage, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"**Mortgaged Property**" means the real property, including any land, fixtures and improvements, securing repayment of the debt evidenced by a Mortgage Note.

"**Mortgagor**" means the obligor on a Mortgage Note.

"**Person**" means any individual, corporation, partnership (general or limited), limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, estate, unincorporated organization, governmental or regulatory body or other entity.

"**Pooling and Servicing Agreements**" means the pooling and servicing agreements and the sale and servicing agreements listed on Schedule 7.03(f) hereto.

"**Program**" shall include any of the following mortgage loan modification programs: (a) for modifications currently in process or initiated within the first ninety (90) days following the signing of this Agreement, the modification program previously approved by the Board of Directors of IndyMac Federal Bank, FSB in Conservatorship; (b) the FDIC's Mortgage Loan Modification Program, a copy of which is attached as an Exhibit F hereto; and (c) any other modifications either to an individual or to a group of borrowers, with prior written consent of the FDIC.

"**Purchaser**" has the meaning given in the preamble.

"**Receiver**" has the meaning given in the recitals.

"**Records**" means copies and originals of all records and documents, whether in hard copy, microfiche, microfilm or electronic format, including but not limited to magnetic tape, disc storage, card forms, printed copy, and electronic stored information (as defined in Rule 34(a) of the Federal Rules of Civil Procedure) which (i) pertain to, and are utilized to administer, reflect, monitor, evidence or record information respecting the assets purchased and the liabilities assumed by the Purchaser pursuant to this Agreement and (ii) are owned by and in the possession of the Seller as of the Closing Date.

"**Reimbursed Party**" has the meaning given in Section 8.01.

"**Remedy**" has the meaning given in Section 8.01.

9

"**REO Property**" means real property to which title is acquired by foreclosure, by deed in lieu of foreclosure, by power of sale or by sale pursuant to the Uniform Commercial Code, in any such case, in connection with the enforcement of the terms of any Mortgage.

"**RESPA**" means the Real Estate Settlement Procedures Act of 1974, as amended, and all rules and regulations promulgated thereunder.

"**RHS**" means the Rural Housing Service of the United States Department of Agriculture, or any successor thereto.

"**Securitization Transaction**" means any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly-offered or privately-placed, rated or unrated, mortgage-backed securities or (2) an issuance of publicly-offered or privately-placed, rated or unrated, securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

"**Security Party**" means any of the trustee, Master Servicer, Investor, or Bond Insurer in respect of a Securitization Transaction.

"**Seller**" has the meaning given in the preamble.

"**Servicing Adjustment**" has the meaning set forth in Section 2.14(a).

"**Servicing Adjustment Settlement Date**" means the second anniversary of the Closing Date.

"**Servicing Advance Purchase Price**" has the meaning given in Section 2.06(a).

"**Servicing Advances**" means all customary, reasonable and necessary out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Seller of its servicing obligations, including, but not limited to, costs and expenses related to (a) the funding of principal and interest advances with respect to Mortgage Loans held in connection with a Securitization Transaction, (b) the preservation, restoration and protection of the Mortgaged Property, (c) any enforcement or judicial proceedings, including foreclosures, (d) the management and liquidation of any REO Property, (e) Taxes, assessments, water rates, sewer rents and other charges which are or may become a Lien upon the Mortgaged Property, and fire and hazard insurance coverage and (f) physical inspection of the Mortgaged Property.

"**Servicing Agreements**" means all Contracts (including Pooling and Servicing Agreements) pursuant to which the Seller acts as a mortgage loan servicer and administers or collects payments, remits to trustees, paying agents or Investors, provides foreclosure services or administers escrow accounts with respect to any mortgage loans which are part of the transactions listed on Schedule 1.01(b) hereto, and any other Contracts entered into by the Seller in its capacity as servicer in connection with any Securitization Transaction included on Schedule 1.01(b); provided, however, that "**Servicing Agreements**" shall not include any of the

10

contracts with the Federal Home Loan Bank of San Francisco listed on Schedule 4.01(c)(ii) to the Master Purchase Agreement.

"**Servicing Fee**" means, with respect to each Mortgage Loan, the amount set forth on the Mortgage Loan Schedule.

"**Servicing File**" means, with respect to each Mortgage Loan, all documents in the possession of the Seller or its agents relating to the origination and servicing of the related Mortgage Loan, including copies, which may be imaged copies, of all documents in the Mortgage File and all other papers and records in the possession of the Seller used to service the Mortgage Loans.

"**Servicing Rights**" means any and all of the following: (a) all rights to service a Mortgage Loan; (b) all rights to receive servicing fees, additional servicing compensation (including any late fees, Change Fees, assumption fees, penalties (other than prepayment penalties) or similar payments with respect to the Mortgage Loan, and income on escrow accounts or other receipts on or with respect to the Mortgage Loan), reimbursements or indemnification for servicing the Mortgage Loan, and any payments received in respect of the foregoing and proceeds thereof; (c) the right to collect, hold and disburse Escrow Payments or other payments with respect to the Mortgage Loans and any amounts actually collected with respect thereto and to receive interest income on such amounts to the extent permitted by applicable Law; (d) all accounts and other rights to payment related to any of the property described in this paragraph; (e) possession and use of any and all Servicing Files pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans; (f) to the extent applicable, all rights and benefits relating to the direct solicitation of the related Mortgagors for refinance or modification of the Mortgage Loans and attendant right, title and interest in and to the list of such Mortgagors and data relating to their respective Mortgage Loans; (g) all rights, powers and privileges incident to any of the foregoing; and (h) all agreements or documents creating, defining or evidencing any of the foregoing rights to the extent they relate to such rights.

"**State Agency**" means any state agency with authority to (i) regulate the businesses of the Purchaser including any state agency with authority to determine the investment, origination, lending or servicing requirements with regard to Mortgage Loans originated, purchased or serviced by the Purchaser or (ii) originate, purchase or service Mortgage Loans, or otherwise promote mortgage lending, including without limitation state and local housing finance authorities.

"**Tax**" or "**Taxes**" means all income, excise, gross receipts, ad valorem, sales, use, employment, franchise, profits, gains, property, transfer, payroll, withholding, severance, occupation, social security, unemployment compensation, alternative minimum, value added, intangibles or other taxes, fees, stamp taxes, duties, charges, levies or assessments of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, fines, additions to tax or additional amounts imposed by any Governmental Authority with respect thereto.

11

"**Tax Authority**" means any branch, office, department, agency, instrumentality, court, tribunal, officer, employee, designee, representative, or other Person that is acting for, on behalf of, or as a part of any foreign or domestic government (or any state, local or other political subdivision thereof) that is engaged in or has any power, duty, responsibility or obligation relating to the legislation, promulgation, interpretation, enforcement, regulation, monitoring, supervision or collection of or any other activity relating to any Tax or Tax Return.

"**Tax Return**" means any return, election, declaration, report, schedule, information return, document, information, opinion, statement, or any amendment to any of the foregoing (including any consolidated, combined or unitary return) submitted or required to be submitted to any Tax Authority.

"**Then-Current Interest Rate**" means the most recently published Freddie Mac survey rate for 30-year fixed-rate loans or, if such Freddie Mac survey rate is not available, then another comparable nationally published rate for 30-year fixed-rate loans.

"**Third Party Claim**" means a claim, counterclaim or demand made by any Person (other than the Purchaser or any of its Affiliates) against the Purchaser arising out of or as a result of a Defect.

"**Treasury Regulations**" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, substitute, proposed or final Treasury Regulations.

"**Trust Documents**" means, with respect to each Securitization Transaction included on Schedule 1.01(b), (i) the Pooling and Servicing Agreement, (ii) any other applicable Servicing Agreement, (iii) an assignment, assumption and recognition agreement related to such Servicing Agreement, if any, in each case, entered into by and among the applicable Security Parties, which individually relate to the securitization and servicing of the applicable Mortgage Loans, and (iv) the custodial agreement.

"**VA**" means the Department of Veteran's Affairs, or any successor thereto.

Section 1.02    Construction.    This Agreement shall be construed and interpreted in accordance with the following:

(a)    References to "Affiliates" include only other Persons which from time to time constitute "Affiliates" of such specified Person, and do not include, at any particular time, other Persons that may have been, but at such time have ceased to be, "Affiliates" of such specified Person, except to the extent that any such reference specifically provides otherwise.

(b)    The term "or" is not exclusive.

(c)    A reference to a law includes any amendment, modification or replacement to such law.

(d)     Accounting terms shall have the meanings assigned to them by GAAP applied on a consistent basis by the accounting entity to which they refer.

(e)     References to any document, instrument or agreement (i) shall be deemed to include all appendices, exhibits, schedules and other attachments thereto and all documents, instruments or agreements issued or executed in replacement thereof, and (ii) shall mean such document, instrument or agreement, or replacement thereto, as amended, modified and supplemented from time to time in accordance with its terms and as the same is in effect at any given time.

(f)     Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(g)     The words "include" and "including" and words of similar import are not limiting, and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words.

(h)     The word "during" when used with respect to a period of time shall be construed to mean commencing at the beginning of such period and continuing until the end of such period.

(i)     Unless the context otherwise requires, singular nouns and pronouns when used herein shall be deemed to include the plural and vice versa and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

## ARTICLE II

## THE PURCHASE AND SALE

Section 2.01    Purchase and Sale of Assets.  On the terms and subject to the conditions contained herein and in the Ancillary Documents, the Seller hereby sells, transfers, conveys, assigns and delivers to the Purchaser, and the Purchaser hereby purchases, accepts and assumes from the Seller, without representation or warranty, express or implied, except as set forth in this Agreement or the Master Purchase Agreement, all of the Seller's rights, title and interests in, to and under the Assets (other than the Excluded Assets).  "**Assets**" means the following assets, whether owned, leased, licensed or otherwise contracted by, or otherwise available to, the Seller, and no others (except that, as set forth below, the Schedules described in this Section 2.01 shall be updated as of the Closing and assets included in such updated Schedules shall constitute Assets):

(a)     all Servicing Rights accruing to the Seller under the Servicing Agreements, including all rights to assert claims and take other rightful actions in respect of breaches, defaults and other violations of such Servicing Agreements;

(b)     all unreimbursed Servicing Advances listed on Schedule 2.01(b);

(c)     all Servicing Fee receivables listed on Schedule 2.01(c), including all accrued interest;

13

(d)     [Reserved];

(e)     all guarantees, warranties, indemnities and similar rights in favor of the Seller with respect to any of the Assets;

(f)     the Escrow Accounts listed on Schedule 2.01(f);

(g)     all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by or for the benefit of the Seller with respect to the Business or the ownership, use, function, value of or other rights pertaining to any Asset, whether arising by way of counterclaim or otherwise, other than any claims retained by the Seller pursuant to Section 2.05; and

(h)     all of the outstanding stock of the Acquired Subsidiary.

To the extent that any party discovers, within 180 days following the Closing Date, that there were assets of the Seller used primarily in the Business that all parties hereto intended to be transferred in connection with the purchase contemplated in this Agreement, but that were omitted from the schedules to this Agreement, the Seller shall or shall cause its Affiliates promptly to assign and transfer to the Purchaser all right, title and interest in such asset.

Each Schedule referenced above shall be updated as of the Closing Date and delivered to the Purchaser in accordance with Section 2.10.

Section 2.02     Excluded Assets.     Notwithstanding anything to the contrary in Section 2.01, the Assets shall not include, and the Purchaser shall not purchase or otherwise acquire, the Excluded Assets.

Section 2.03     Assumption of Liabilities.     On the terms and subject to the conditions contained herein and in the Ancillary Documents (including the retention of all rights and remedies under Article XVII of the Master Purchase Agreement and under Articles VII and VIII hereto), the Purchaser shall assume and agree to pay, perform and discharge in accordance with their terms all of the following obligations, debts and liabilities of the Seller and no others (collectively, the "**Assumed Liabilities**"):

(a)     all accounts payable and other accrued expenses (other than any intracompany accounts payable) as of the Closing Date, in each case that relate to the Assets, as reflected on the Accounting Records;

(b)     with respect to Mortgage Loans acquired by Fannie Mae, Freddie Mac or Ginnie Mae from the Seller, the Failed Thrift or IndyMac Federal ("**GSE Mortgage Loans**"), all obligations of the Seller under the Servicing Agreements from and after the Closing Date;

(c)     with respect to Mortgage Loans other than GSE Mortgage Loans, all obligations imposed on the servicer under the Servicing Agreements from and after the Closing Date; and

(d)     all obligations of the Seller with respect to (i) the lawsuits, judgments, claims or demands listed on Schedule 2.03(c), and (ii) any additional lawsuits, judgments, claims or

demands involving foreclosures, bankruptcies, fraud and misrepresentation, contract and mortgage disputes, liens, title disputes, regulatory agency/fair lending, property condition, forfeiture, partition, easement, condemnation and eminent domain, probate, contested foreclosures, tax sale, mechanic's liens, elder abuse and stop notice claims with respect to any of the Assets, but only to the extent any such additional lawsuit, judgment, claim or demand is comparable in nature, scope and substance to those listed on Schedule 2.03(c), as determined by the Seller in its reasonable judgment (as evidenced by written notice thereof given to the Purchaser), if such determination is made (and such notice is provided) within sixty (60) days after the Closing Date, or by the mutual agreement of the Purchaser and the Seller, if such determination is after such sixty (60)-day period.

Section 2.04    Excluded Liabilities.    Notwithstanding anything to the contrary in Section 2.03, it is understood and agreed that the Seller shall not assign and the Purchaser shall not, pursuant to this Agreement, assume or be liable for any Excluded Liabilities that the Seller has or may have now or in the future, including the following:

(a)    any liabilities and obligations of the Seller arising under this Agreement or any of the Ancillary Documents;

(b)    any liabilities or obligations of the Seller arising under or in connection with any Employee Plan or any liability or obligation of the Seller relating to salaries, wages, bonuses, vacation or severance pay or other compensation, payments or benefits earned, accrued or arising through the end of the Closing Date;

(c)    any liabilities or obligations of the Seller under any Contracts relating to the Excluded Assets or under any Excluded Contracts;

(d)    any legal and accounting fees and expenses incurred by the Seller in connection with the consummation of the transactions contemplated by this Agreement, except as provided in the Master Purchase Agreement;

(e)    any Tax liabilities and obligations of the Seller with respect to the Business for any taxable period (or portion thereof) ending on or before the Closing Date;

(f)    any indebtedness of the Seller for borrowed money;

(g)    any liability or indebtedness of the Seller for contingent liabilities or liabilities in respect of any injury to any Person or property;

(h)    any liabilities or obligations of the Seller resulting from violations of any Laws (including any Laws relating to Taxes, immigration, employment or labor matters, or environmental matters);

(i)    any liabilities or obligations of the Seller attributable to an act, omission or circumstances that occurred or existed prior to the Closing Date, other than the Assumed Liabilities;

(j)    all liabilities and obligations arising out of or with respect to the Excluded Assets;

15

(k)     all obligations of the Seller with respect to any lawsuits, judgments, claims or demands of any nature existing on or prior to the Closing Date that are not listed on Schedule 2.03(c) or otherwise described in Section 2.03(c);

(l)     any liabilities or obligations imposed on the seller of loans under the Servicing Agreements with respect to Mortgage Loans other than GSE Mortgage Loans, including, without limitation, any repurchase obligations for breaches of loan level representations, any indemnities relating to origination activities or securities laws or any seller indemnity;

(m)    any claim against or liability of the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal that, under and in accordance with applicable Law, was, is or will be subject to the receivership administrative claims processes administered by the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal pursuant to 12 U.S.C. §1821(d)(3) through (13), including claims and liabilities that are affirmative or defensive, now existing or arising in the future, contingent or fixed, monetary or non-monetary, equitable or legal, or declarative or injunctive;

(n)     any claim against or liability based on any alleged act or omission of the Failed Thrift or IndyMac Federal which is not provable or allowable, or is otherwise barred against the FDIC as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal under applicable Law, including claims and liabilities that are barred under 12 U.S.C. §§1821(c), (d), (e) (including §1821(e)(3)), (i), or (j); 12 U.S.C. §1822; 12 U.S.C. §1823; or 12 U.S.C. §1825; and

(o)     any stand-alone insurance and indemnity agreements or similar agreements between the Failed Thrift or IndyMac Federal and any Bond Insurer with respect to any Securitization Transaction and all liabilities and obligations thereunder.

Section 2.05    Retained Claims and Release.    Notwithstanding anything to the contrary contained in this Agreement, the Purchaser and the Seller hereby agree that the sale and transfer of the Servicing Rights pursuant to this Agreement will exclude the transfer to the Purchaser of all right, title and interest of the Seller in and to any and all claims of any nature whatsoever that might now exist or hereafter arise, whether known or unknown, that the Seller has or might have against any of the following: (a) officers, directors, employees, insiders, accountants, attorneys, other Persons employed by the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest, underwriters or any other similar Persons who have caused a loss to the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest in connection with the origination, servicing or administration of a Mortgage Loan, (b) any appraisers, accountants, auditors, attorneys, investment bankers or brokers, loan brokers, deposit brokers, securities dealers or other Persons who performed services for the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest relative to a Mortgage Loan, (c) any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of a Mortgage Loan or (d) any appraiser or other Person with whom the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest or any servicing agent contracted for services or title insurance in connection with the making, insuring or servicing of a Mortgage Loan.

Section 2.06    Purchase Price; Closing Payment.

(a)    Subject to the terms and conditions of this Agreement and the Master Purchase Agreement, the Purchaser shall pay to the Seller, in accordance with the procedures set forth in this Agreement and the Master Purchase Agreement, an aggregate purchase price for the Assets in an amount equal to the sum of (such sum, the "**Group 2 Final Purchase Price**"):

> (i)    with respect to the Servicing Rights, an amount equal to the sum of each product obtained by multiplying (x) the unpaid principal balance of the Mortgage Loans, as shown on the Mortgage Loan Schedule as updated as of the Closing Date, within each category set forth on Schedule 2.06 by (y) the applicable percentage for such category shown on Schedule 2.06; plus

> (ii)    with respect to the outstanding Servicing Advances, an amount equal to the Book Value of such assets as of the Closing Date ("**Servicing Advance Purchase Price**"); plus

> (iii)    with respect to the accrued Servicing Fee receivables with respect to Mortgage Loans held in connection with a non-HELOC Securitization Transaction, an amount equal to one hundred percent (100%) of the Book Value of such assets as of the Closing Date; plus

> (iv)    with respect to the accrued Servicing Fee receivables with respect to Mortgage Loans held in connection with a HELOC Securitization Transaction, an amount equal to zero percent (0%) of the Book Value of such assets as of the Closing Date; plus

> (v)    with respect to the accrued Servicing Fee receivables with respect to Mortgage Loans serviced for an Agency or any Federal Home Loan Bank that are less than thirty (30) days past due, an amount equal to one hundred percent (100%) of the Book Value of such assets as of the Closing Date; plus

> (vi)    with respect to the accrued Servicing Fee receivables with respect to Mortgage Loans serviced for an Agency or any Federal Home Loan Bank that are thirty (30) days or more past due, an amount equal to zero percent (0%) of the Book Value of such assets as of the Closing Date.

(b)    On the Closing Date, the Purchaser shall pay to the Seller in accordance with the Master Purchase Agreement an amount equal to the balance of (i) the Group 2 Final Purchase Price, calculated using, where applicable, balances as of the Initial Calculation Date rather than the Closing Date, less (ii) two percent (2.0%) of the Servicing Advance Purchase Price calculated using the Book Value of the Servicing Advances as of the Initial Calculation Date, less (iii) prorated amounts owed by the Seller through and including the Closing Date which are calculable as of the Closing Date, as determined pursuant to Section 2.07, plus (iv) to the extent not otherwise covered, an amount equal to any negative escrow balance (expressed as a negative amount), to the extent such negative escrow balance exists after netting negative escrow balances with positive escrow balances in accordance with Section 5.02 of this Agreement (collectively,

17

the "**Group 2 Closing Payment**"). The Seller shall also provide to the Purchaser reasonable supporting information and documentation that is relied upon in connection with such calculation.

Section 2.07    Prorations. All real and personal property Taxes related to the Assets, whether or not payable after the Closing Date, shall be prorated between the Purchaser and the Seller, as the case may be, on the basis of a 365 day year and the number of days elapsed and days remaining in the applicable period through the end of the Closing Date. All amounts prorated pursuant to this Section 2.07 will be taken into account in connection with the adjustments provided in Section 2.11.

Section 2.08    Closing. The closing of the sale provided for in this Agreement, herein referred to as the "**Closing**", shall take place pursuant to the procedures and subject to the conditions set forth in this Agreement and the Master Purchase Agreement.

Section 2.09    Closing Procedure. At the Closing, subject to and upon the terms and conditions of this Agreement and the Master Purchase Agreement:

(a)    the Seller shall deliver to the Purchaser the certificates, instruments and documents referred to in Section 4.01;

(b)    the Purchaser shall deliver to the Seller the certificates, instruments and documents referred to in Section 4.02; and

(c)    the Purchaser shall deliver to the Seller the Group 2 Closing Payment.

Section 2.10    Closing Adjustment Documents.    Within sixty (60) calendar days following the Closing Date, the Purchaser shall prepare and deliver to the Seller (i) Schedule 1.01(a), Schedule 2.01(b), Schedule 2.01(c) and Schedule 2.01(f), each updated as of the Closing Date and prepared in accordance with the Accounting Records and consistent with past practice (including the preparation of the Schedules attached hereto), and (ii) a schedule setting forth in reasonable detail the calculations contemplated by Section 2.11 (collectively, the "**Closing Adjustment Documents**"). The parties shall cooperate in the preparation of the Closing Adjustment Documents and such additional documents as may be necessary to calculate the Group 2 Final Payment. Without limiting the generality of the foregoing, to the extent necessary, the Purchaser shall provide the Seller and its designees with reasonable access to the Purchaser's books, Records, working papers, personnel and representatives which relate to the Assets and the Assumed Liabilities.

Section 2.11    Calculation of Adjustments. The Closing Adjustment Documents shall set forth the Purchaser's calculation of (a) the Group 2 Final Purchase Price in accordance with Section 2.06(a) and (b) a payment amount (such amount, the "**Group 2 Final Payment**") which shall be the sum of the following: (i) the Group 2 Final Purchase Price, less (ii) two percent (2.0%) of the Servicing Advance Purchase Price calculated as of the Closing Date calculated using the Book Value of the Servicing Advances as of the Closing Date (the "**Advance Holdback Amount**"), less (iii) prorated amounts owed by the Seller through and including the Closing Date, as determined pursuant to Section 2.07, plus (iv) to the extent not otherwise covered, an amount equal to any negative escrow balance (expressed as a negative amount), to the extent such negative escrow balance exists after netting negative escrow balances with

18

positive escrow balances in accordance with <u>Section 5.02</u> of this Agreement, <u>less</u> (v) any Servicing Adjustment pursuant to <u>Section 2.14</u> which is calculable at the time of the determination of the Group 2 Final Payment.  The Closing Adjustment Documents shall be reviewed, and any Disagreements related thereto resolved, in accordance with the Master Purchase Agreement.

      Section 2.12   <u>Final Settlement</u>.  Final settlement of the Group 2 Final Purchase Price shall be made in accordance with the Master Purchase Agreement.

      Section 2.13   <u>Release of the Advance Holdback Amount</u>.

      (a)   On the tenth (10th) Business Day following the end of each month between the Closing Date and the Advance Holdback Calculation Date, the Purchaser shall provide to the Seller a schedule setting forth the Servicing Advances outstanding as of the end of each such month as compared to the Servicing Advances outstanding as of the Closing Date and as of the end of the immediately preceding month.  On the fifth (5th) Business Day following the receipt of such schedule, the Purchaser shall pay to the Seller an amount equal to the Advance Holdback Amount multiplied by the quotient of (i) the Servicing Advances repaid to the Purchaser in such month divided by (ii) the total Servicing Advances outstanding as of the Closing Date.

      (b)   On the tenth (10th) Business Day following the Advance Holdback Calculation Date, the Purchaser shall provide to the Seller a final schedule setting forth the Servicing Advances, if any, outstanding as of the Advance Holdback Calculation Date and specifying any Servicing Advances that Purchaser, in its good faith reasonable judgment, deems to be non-recoverable and the reasons therefor.  In the event any portion of the Advance Holdback Amount remains unpaid in accordance with the terms of <u>Section 2.13(a)</u> as of the Advance Holdback Calculation Date, then on the Advance Holdback Settlement Date the Purchaser shall pay to the Seller seventy-five percent (75%) of an amount equal to the remainder of the Advance Holdback Amount less the amount of any non-recoverable Servicing Advances (the "**Holdback Settlement Payment**").  For the avoidance of doubt, the Holdback Settlement Payment shall not include any portion of the Advance Holdback Amount attributable to Servicing Advances that have been reimbursed to the Purchaser pursuant to clause (y) of <u>Section 2.14(a)</u>.  The Holdback Settlement Payment shall be paid by wire transfer of immediately available funds to an account designated by the Seller.  Any portion of the Advance Holdback Amount outstanding after the Holdback Settlement Payment is made shall revert to the Purchaser and the Seller shall have no further rights to such portion.

      Section 2.14   <u>Servicing Adjustment</u>.

      (a)   To the extent that any Servicing Rights are transferred to the Purchaser at the Closing but are involuntarily transferred to a third party after the Closing Date but prior to the Servicing Adjustment Settlement Date and such transfer to the third party is a direct result of the termination of the Servicing Rights prior to the Closing Date, the failure of the Seller to assign and the Purchaser to assume the Excluded Liabilities described in <u>Section 2.04(o)</u> or the failure to obtain any required consent to transfer such Servicing Rights to the Purchaser (the Servicing Rights transferred to the third party, the "**Excluded Servicing Rights**"), then, (x) subject to the provisions of <u>Section 2.14(b)</u>, the Group 2 Final Purchase Price will be reduced (the "**Servicing**

**Adjustment**") by an amount equal to the purchase price percentage (as set forth on Schedule 2.06) applicable to the category of Mortgage Loans subject to such Excluded Servicing Rights (as set forth in Schedule 2.06) multiplied by the unpaid principal balance of the Mortgage Loans subject to such Excluded Servicing Rights, such unpaid principal balance calculated at the time of the transfer to the third party and (y) the Seller shall reimburse the Purchaser for any outstanding Servicing Advances made with respect to the Excluded Servicing Rights less the amount of any related Advance Holdback Amount.

(b)     The Servicing Adjustment provided for in Section 2.14(a) shall not be made with respect to:

      (i)     any transfer of Servicing Rights to a third party after the Closing Date for "cause" due to the acts of the Purchaser as such term is used under the applicable Servicing Agreement;

      (ii)     any transfer of Servicing Rights to a third party to which the Purchaser consents or in connection with which the Purchaser or any Affiliate of the Purchaser receives any monetary compensation;

      (iii)     any Servicing Rights with respect to any Mortgage Loans for which the primary servicing is transferred to a third party solely as a result of the failure to obtain any of the required consents to transfer such servicing to the Purchaser to the extent that the Purchaser elects to continue to subservice such Mortgage Loans (other than transitional services for less than 90 days, in which case the unpaid principal balance of the Mortgage Loans subject to such Excluded Servicing Rights shall be calculated as of the end of the transitional service period); or

      (iv)     any voluntary transfer of Servicing Rights to a special servicer with respect to delinquent Mortgage Loans.

(c)     Within five (5) Business Days after the end of each month between the Closing Date and the Servicing Adjustment Settlement Date, the Purchaser shall deliver to the Seller a report showing Excluded Servicing Rights broken down by the categories set forth on Schedule 2.06. Within five (5) Business Days following delivery of each such report, the Seller shall pay to the Purchaser the applicable Servicing Adjustment by wire transfer in immediately available funds to an account designated by the Purchaser.

## ARTICLE III

### PRE-CLOSING COVENANTS

Section 3.01    Transition. The Seller and the Purchaser shall mutually cooperate in order to facilitate an orderly transition of the Assets and Assumed Liabilities to the Purchaser, and in order to facilitate the integration of the operations of the Seller (including all information technology systems) and the Purchaser, as soon as practicable after the Closing Date. Each party will cooperate in good faith with the other and will take all appropriate action that may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder.

From and after the Closing Date, the Seller will promptly refer all inquiries with respect to the Assets (including ownership thereof) and Assumed Liabilities to the Purchaser, and the Purchaser will promptly refer all inquires with respect to the Excluded Assets (including ownership thereof) and Excluded Liabilities to the Seller.

Section 3.02    Employees.  The hiring of the Seller's employees by the Purchaser and related employee benefit issues will be subject to the provisions of the Master Purchase Agreement.

Section 3.03    Agency Approvals; Qualification to Act as Servicer.  As of the Closing Date, the Purchaser will be an approved seller/servicer or issuer, as applicable, of mortgage loans for HUD, Ginnie Mae and Fannie Mae, with the facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the Mortgage Loans.  As of the Closing Date, the Purchaser will be a HUD approved mortgagee pursuant to Section 203 of the National Housing Act and will be in good standing to sell mortgage loans to and service mortgage loans for HUD, and no event will have occurred, including a change in insurance coverage, which would make the Purchaser unable to comply with HUD, Ginnie Mae and Fannie Mae eligibility requirements or which would require notification to HUD, Ginnie Mae or Fannie Mae.  Furthermore, if, at any time prior to the termination of this Agreement, the Purchaser is unable to comply with any of the Fannie Mae, Ginnie Mae or HUD eligibility requirements, it shall promptly notify the Seller that it is no longer an approved seller/servicer of reverse mortgage loans for Fannie Mae, Ginnie Mae or HUD.  As of the Closing Date, the Purchaser will be a qualified servicer under each Servicing Agreement.

Section 3.04    Additional Title Documents.  The Seller and the Purchaser each agree, at any time, and from time to time, upon the request of the other party, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the Purchaser its full legal or equitable title in and to the Assets.  The Purchaser shall prepare such instruments and documents of conveyance (in form and substance reasonably satisfactory to the Seller) as shall be necessary to vest title to the Assets in the Purchaser.  The Purchaser shall be responsible for recording such instruments and documents of conveyance.  All expenses incurred by the Purchaser in compliance with this Section 3.04 shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

## ARTICLE IV

## CLOSING DELIVERIES

Section 4.01    Seller's Deliverables.  In addition to any other documents to be delivered under other provisions of this Agreement or the Master Purchase Agreement, the Seller shall deliver and release, subject to and in accordance with this Section, to the Purchaser the following on or prior to the Closing:

(a)    an original Bill of Sale executed by the Seller;

(b)    four originals of the Assignment and Assumption Agreement executed by the Seller;

21

(c)     four originals of this Agreement executed by the Seller;

(d)     executed Affidavit of Lost Certificate for the Acquired Subsidiary;

(e)     an original Limited Power of Attorney granted by the Seller pursuant to Section 5.04 hereof;

(f)     executed resignations from each director and officer of the Acquired Subsidiary;

(g)     a copy of the articles of incorporation of the Acquired Subsidiary, certified by the secretary or another authorized officer of the Acquired Subsidiary; and

(h)     a copy of the bylaws of the Acquired Subsidiary, certified by the secretary or another authorized officer of the Acquired Subsidiary.

Section 4.02   Purchaser's Deliverables.   In addition to any other documents to be delivered under other provisions of this Agreement or the Master Purchase Agreement, the Purchaser shall deliver and release, subject to and in accordance with this Section, to the Seller the following on or prior to the Closing:

(a)     the Group 2 Closing Payment in accordance with the Master Purchase Agreement;

(b)     four originals of the Assignment and Assumption Agreement executed by the Purchaser; and

(c)     four originals of this Agreement executed by the Purchaser.

## ARTICLE V

## TRANSFER OF MORTGAGE RELATED ASSETS

Section 5.01   Transfer of Documents, etc.   The Seller and the Purchaser shall cooperate with each other in the physical or other transfer to the Purchaser or its designee on the Closing Date of the Servicing Rights and the Servicing Files in respect of the Mortgage Loans.

Section 5.02   Unremitted Collections; Escrow Accounts and Custodial Accounts. Escrow funds, custodial funds and other amounts or balances related to the Mortgage Loans on deposit in Escrow Accounts, Custodial Accounts or other accounts held or controlled by the Seller shall be transferred by the Seller, along with the related accounts, to the Purchaser on the Closing Date. It is intended that the Seller will use commercially reasonable efforts to cause such Escrow Accounts, Custodial Accounts and other accounts to be retitled in the name of the Purchaser. All such funds and related accounts shall become the responsibility of the Purchaser when transferred by the Seller. Any negative escrow balances shall be netted against the amount of any positive escrow balances held in the Escrow Accounts transferred to the Purchaser. On and after the Closing Date, if a shortfall is discovered in an Escrow Account or reserve fund established under a Servicing Agreement or advances are required to be made and the servicer is required pursuant to the terms of the applicable Servicing Agreement either to fund such Escrow

22

Account or reserve fund shortfall or to make advances, the Purchaser shall fund such shortfall or make such advances, as applicable (to the extent such amounts have not been accounted for in the calculation of the Group 2 Final Payment pursuant to Section 2.11) .

Section 5.03    Invoices.  All invoices (including Tax and insurance invoices) pertaining to the servicing of the Mortgage Loans or any other Contracts and which are in the Seller's possession on or prior to the Closing Date and due and payable within fifteen (15) Business Days after the Closing Date shall be paid by the Seller in accordance with applicable Investor Requirements and Contract requirements on or prior to the Closing Date.  Notwithstanding the foregoing, amounts so paid by the Seller shall be pro rated between the Seller and the Purchaser and may be netted against amounts otherwise payable by or due to the Purchaser, as applicable, pursuant to Section 2.07.  All other invoices, transmittal lists or any other information used to pay such invoices which are received after the Closing Date shall be forwarded by the Seller to the Purchaser in accordance with Section 5.05.  All penalties and interest due as a result of the Seller's failure to pay invoices which are in the Seller's possession on or prior to the Closing Date and due and payable within fifteen (15) Business Days after the Closing Date or where the Seller failed to forward invoice information to the Purchaser in accordance with Section 5.05 shall be borne by the Seller.

Section 5.04    Notice to Mortgagors.    The Purchaser shall, on a timely basis in accordance with RESPA, Investor Requirements and any other applicable Laws, and pursuant to the Limited Power of Attorney granted by the Seller to the Purchaser, in the form attached hereto as Exhibit E, prepare and transmit to each Mortgagor a joint "hello" and "goodbye" letter, at the Purchaser's expense.  The form of such letter shall be subject to the review and reasonable approval of the Seller.

Section 5.05    Forwarding Post-Closing Date Items.  With respect to any checks or other funds in respect of any Mortgage Loan which are received by the Seller within thirty (30) calendar days after the Closing Date, the Seller shall, to the extent no Limited Power of Attorney is granted to the Purchaser in accordance with Section 5.04, promptly endorse without recourse and send the same to the Purchaser via overnight mail.  Any checks or other funds in respect of any Mortgage Loan which are received by the Seller after such thirty (30) day period shall be endorsed without recourse by the Seller to the Purchaser and sent by first class mail to the Purchaser promptly after receipt.  Except as otherwise provided herein, the Seller shall promptly forward to the Purchaser all Mortgagor, Investor and Insurer correspondence, Tax bills or any other correspondence or documentation related to any of the Mortgage Loans, the Servicing Rights or the other Assets which is received by the Seller after the Closing Date.

Section 5.06    Misapplied and Returned Payments.  Misapplied and returned payments with respect to the Mortgage Loans shall be processed as follows:

(a)    Both parties shall cooperate in correcting misapplication errors;

(b)    The party receiving notice of a misapplied payment shall promptly notify the other party;

(c)     If a misapplied payment has created an improper Group 2 Closing Payment or Group 2 Final Payment as the result of an inaccurate outstanding principal balance or escrow balance, respectively, a check shall be issued to the party shorted by the improper payment application within ten (10) Business Days after notice thereof by the other party;

(d)     Any check issued under the provisions of this Section 5.06 shall be accompanied by a statement indicating the purpose of the check, the Mortgagor and property address involved, and the corresponding Seller and Purchaser account number; and

(e)     If any Mortgagor's check presented to the Seller prior to the Closing Date is returned unpaid to the Seller for any reason subsequent to the Closing Date, the Seller shall promptly forward the original unpaid check to the Purchaser and, upon the Seller's demand, (i) if the final settlement of the Group 2 Final Purchase Price pursuant to Section 2.12 has not yet occurred, such returned amount will be reflected in the Group 2 Final Purchase Price when calculated or (ii) if the final settlement has already occurred, depending on the category of payment that was returned, such reimbursement shall be calculated by application of the relevant percentage listed on Schedule 2.06.

Section 5.07     Notice to Insurers, Tax Authorities and Bankruptcy Trustees.     Within fifteen (15) days after the Closing Date, the Purchaser shall, in accordance with applicable Insurer requirements, provide written notice of the transfer to any Insurer requiring such notice; provided, however, that the Purchaser may give aggregate notice whenever possible.     The Purchaser shall notify tax-bill services of the transfer.  The form of all notices pursuant to this Section 5.07 shall be subject to the review and reasonable approval of the Seller.

Section 5.08     Tax and Flood Contracts.  The Seller shall cooperate with the Purchaser to assign and transfer to the Purchaser, at the Seller's expense, within a reasonable period of time following the Closing Date, and in no event more than sixty (60) days after the Closing Date, (i) any "life-of-loan" assignable tax contracts with respect to the Mortgage Loans, and (ii) any assignable flood zone certification contracts with respect to the Mortgage Loans.

Section 5.09     Custodial Agreements.     On the Closing Date, the Seller, with the cooperation of the Purchaser, shall assign and transfer to the Purchaser any document custodial agreements between the Seller and any document custodian that relate to the Mortgage Loans. In the event there exist document custodial agreements that are not assigned, the Purchaser shall be responsible for entering into new document custodial agreements and for obtaining any necessary Agency approvals regarding any new custodial arrangements required as a result of this transaction on the Closing Date. Any fees charged by the Seller's document custodians due to termination of custodial agreements by the Seller on or prior to the Closing Date shall be borne by the Seller. The Purchaser shall pay all document custodial fees of any custodian engaged by the Purchaser. In addition, any and all fees charged for termination of a custodial arrangement after the Closing Date and all fees and other charges incurred to transfer files to or from a custodian in connection with this transaction (whether before or after the Closing Date) shall be paid by the Purchaser.

Section 5.10     Servicing of REO Property.  To the extent the Seller holds title to an REO Property solely as nominee for the benefit of the owner of the Mortgage Loan, with respect to

24

each such REO Property, the Seller shall transfer, or cause to be transferred, to the Purchaser an original, executed limited warranty deed, in recordable form on or prior to the Closing Date.

Section 5.11    MERS Mortgage Loans.  With respect to each Mortgage Loan registered on the MERS® System, the Seller shall notify MERS of the transfer of servicing of each Mortgage Loan to the Purchaser. All expenses incurred in compliance with this Section 5.11 shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

Section 5.12    GLBA.  In connection with the sale and transfer of the Servicing Rights hereunder, each of the parties shall comply with the applicable provisions of the Gramm-Leach-Bliley Act of 1999 (the "**GLBA**") and any applicable state and local privacy laws pursuant to the GLBA for financial institutions and applicable state and local privacy laws.

Section 5.13    Mortgage Loans in Litigation.

(a)    With respect to any Mortgage Loans that, at the Closing Date, are subject to any pending litigation that is listed on Schedule 2.03(c) or of which the Purchaser has received written notice from the Seller, the Purchaser shall notify the FDIC's Regional Counsel, 1601 Bryan Street, Dallas, Texas 75201, within thirty (30) Business Days after the Closing Date, or within thirty (30) Business Days after receiving such written notice, as the case may be, of the name of the attorney selected by the Purchaser to represent the Purchaser's interests in the litigation. The Purchaser shall, within thirty (30) Business Days after the Closing Date, or within thirty (30) Business Days after receiving the written notice described above, as the case may be, notify the clerk of the court or other appropriate official and all counsel of record that ownership of the Asset was transferred from the Seller to the Purchaser. Subject to the provisions of Section 5.15, the Purchaser shall have its attorney file appropriate pleadings and other documents and instruments with the court or other appropriate body within thirty-five (35) Business Days after the Closing Date, or within thirty-five (35) Business Days after receiving the written notice described above, as the case may be, substituting the Purchaser's attorney for the Seller's attorney, removing the Seller and IndyMac Federal (or its predecessors-in-interest) as a party to the litigation and substituting the Purchaser as the real party-in-interest. Except as otherwise provided in Section 5.13(b) (and the Purchaser's compliance with its obligations therein), in the event the Purchaser fails to comply with this Section 5.13(a) within thirty-five (35) Business Days after the Closing Date, or within thirty-five (35) Business Days after receiving the written notice described above, as the case may be, the Seller may, at its option, dismiss with or without prejudice or withdraw from, any such pending litigation.

(b)    If the Purchaser is unable, as a matter of applicable Law or due to the actions or inactions of third parties unrelated to the Purchaser and over whom the Purchaser has no control, to cause the Seller and IndyMac Federal (or its predecessors-in-interest) to be replaced by the Purchaser as party-in-interest in any pending litigation as required by Section 5.13(a), the Purchaser shall provide to the FDIC's Regional Counsel, at the address specified above, within thirty-five (35) Business Days after the Closing Date, or within thirty-five (35) Business Days after receiving the notice described in Section 5.13(a), as the case may be, evidence to such effect and stating the reasons for such failure, including reference to any applicable Law. In any such event, (i) the Purchaser shall cause its attorney to conduct such

25



litigation at the Purchaser's sole cost and expense; (ii) the Purchaser shall cause the removal of the Seller and IndyMac Federal (or its predecessors-in-interest) and substitution of the Purchaser as party-in-interest in such litigation as soon as reasonably practicable; (iii) the Purchaser shall use commercially reasonable efforts to cause such litigation to be resolved by judgment or settlement in as reasonably efficient a manner as practical; (iv) the Seller shall cooperate with the Purchaser and the Purchaser's attorney as reasonably required to bring such litigation or any settlement relating thereto to a reasonable and prompt conclusion; and (v) no settlement shall be agreed upon by the Purchaser or its agents or counsel without the express prior written consent of the Seller, unless such settlement includes an irrevocable and complete waiver and release of any and all potential claims against the Seller and IndyMac Federal (or its predecessors-in-interest) relation to such litigation or the subject Mortgage Loans or obligations by any Person asserting any claim in the litigation and any Mortgagor, and any and all losses, liabilities, claims, causes of action, damages, demands, taxes, fees, costs and expenses relating thereto shall be paid by the Purchaser without recourse of any kind to the Seller or IndyMac Federal (or its predecessors-in-interest). The Purchaser shall provide to the Seller twenty (20) Business Days following the Closing Date a status report for each pending litigation regarding replacement by the Purchaser as the party-in-interest. The Purchaser shall pay all of the costs and expenses incurred by it in connection with the actions required to be taken by it pursuant to Section 5.13(a) and this Section 5.13(b), including all legal fees and expenses and court costs, and shall reimburse the Seller for all reasonable out-of-pocket costs, including all legal expenses, incurred by the Seller on or after the Closing Date with respect to any such litigation, including costs incurred in connection with the dismissal thereof or withdrawal therefrom.

(c)     Notwithstanding the foregoing, the Purchaser shall retain all rights and remedies under Article XVII of the Master Purchase Agreement and under Articles VII and VIII hereto.

Section 5.14     Mortgage Loans in Bankruptcy.  In accordance with Bankruptcy Rules 3001 and 3002, the Purchaser agrees to take all actions necessary to file, within thirty (30) Business Days after the Closing Date, (i) proofs of claims in pending bankruptcy cases involving any Mortgage Loans for which the Seller or IndyMac Federal (or its predecessors-in-interest) have not already filed a proof of claim, and (ii) all documents required by Bankruptcy Rule 3001 and to take all such similar actions as may be required in any relevant jurisdiction in any pending bankruptcy or insolvency case or proceeding in such jurisdiction involving any Assets in order to evidence and assert the Purchaser's rights. The Purchaser shall prepare and provide to the Seller, within thirty (30) Business Days after the Closing Date, an Affidavit and Assignment of Claim or any similar forms as may be required in any relevant Foreign Jurisdiction and shall be acceptable to the Seller, for each Mortgage Loan where a Mortgagor under such Mortgage Loan is in bankruptcy as of the Closing Date. The Purchaser hereby releases the Seller, IndyMac Federal (or its predecessors-in-interest) and the FDIC from any claim, demand, suit or cause of action the Purchaser may have as a result of any action or inaction on the part of the Seller, IndyMac Federal (or its predecessors-in-interest) or the FDIC with respect to such Mortgage Loan, and the Purchaser further agrees to reimburse the Seller for any cost or expense incurred by the Seller as a result of the Purchaser's failure to file an Affidavit and Assignment of Claim or similar forms as required herein.

26

Section 5.15   Retained Claims.   The provisions of Section 5.13 and Section 5.14 are subject to the Seller's retention of claims pursuant to Section 2.05 of this Agreement, including any such claims as may have been asserted in litigation pending as of the Closing Date.  If the Seller determines to pursue any claim retained pursuant to Section 2.05, then, at the Seller's discretion, litigation involving any such claims shall be bifurcated, with the Seller remaining the real party-in-interest and retaining control over (and being responsible for pursuing and bearing the related costs to pursue) claims retained by it pursuant to Section 2.05 and with the Purchaser substituting itself as the real party-in-interest and taking control of (and being responsible for pursuing and bearing the cost of pursuing) the remaining claims in litigation.

<div align="center">

**ARTICLE VI**

**REPRESENTATIONS AND WARRANTIES
OF THE PURCHASER**

</div>

The representations and warranties made by the Purchaser to the Seller with respect to the transactions contemplated hereby are as set forth in the Master Purchase Agreement.

<div align="center">

**ARTICLE VII**

**REPRESENTATIONS AND WARRANTIES; ASSET-LEVEL STATEMENTS**

</div>

Section 7.01   Assets Conveyed "AS IS"; Purchaser Acknowledgments.

(a)   THE ASSETS WILL BE CONVEYED TO THE PURCHASER "AS IS" AND "WITH ALL FAULTS," WITHOUT ANY REPRESENTATION, WARRANTY OR GUARANTY WHATSOEVER, INCLUDING AS TO COLLECTIBILITY, ENFORCEABILITY, VALUE OF COLLATERAL, ABILITY OF ANY OBLIGOR TO REPAY, CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, WHETHER EXPRESS OR IMPLIED OR BY OPERATION OF LAW, BY ANY PERSON, INCLUDING THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY PREDECESSOR-IN-INTEREST OR AFFILIATE OF THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR CONTRACTORS.

(b)   The Purchaser acknowledges that (i) the Seller has performed limited due diligence with respect to the Assets and, therefore, none of the Seller, the Failed Thrift or the FDIC makes (or can make) any representations, warranties or guaranties with respect to the Assets or the presence or absence of Defects, (ii) the statements set forth in Section 7.03 (the "**Asset-Level Statements**") are being provided solely as a means for providing the Purchaser with a basis for a remedy in the event a Defect is discovered, so long as all conditions for obtaining a remedy are otherwise met, (iii) the only remedies available to the Purchaser in connection with any Defect are those that are set forth in Section 8.01, and (iv) in no event will the existence of any Defect be evidence of bad faith, misconduct or fraud, even in the event that it is shown that Seller, the Failed Thrift or the FDIC, or any of their respective directors, employees, officers or agents, knew or should have known of the existence of any facts relating to the existence of such Defect.

(c)     Nothing contained in this Agreement shall be construed as a representation, warranty or guaranty with respect to the Assets or that no Defect exists with respect thereto, whether oral or written, past or present, express or implied or by operation of Law, and each of the Seller, the Failed Thrift and the FDIC specifically disclaims, and the Purchaser expressly waives and releases the Seller, the Failed Thrift and the FDIC from, any and all liability or other obligation under this Agreement with respect to any of the following:

        (i)      except for the remedies set forth in Section 8.01, any Defect; or

        (ii)     any fraud or misrepresentation of any kind in connection with the origination or servicing of a Mortgage Loan, whether committed by the Mortgagor, the originator, a servicer, an appraiser or any other party involved in the origination or servicing of such Mortgage Loan; or

        (iii)    any underwriting deficiency or failure to properly underwrite a Mortgage Loan in any way related to any of the following: (x) a failure to properly verify borrower information, such as income, credit history or rental history, (y) a failure to properly verify the value of the collateral, including as a result of a fraudulent or inaccurate appraisal or otherwise, or (z) the reliance on any fraudulent or overstated borrower information or appraisal.

Section 7.02    Representations and Warranties of the Seller.   The representations and warranties made by the Seller to the Purchaser with respect to the transactions contemplated hereby are as set forth in the Master Purchase Agreement. In addition, the Seller hereby makes the following representations and warranties to the Purchaser as of the Closing Date:

(a)     Organization, Existence and Good Standing of the Acquired Subsidiary.   The Acquired Subsidiary is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation.

(b)     Capitalization of the Acquired Subsidiary.   All of the outstanding shares of the Acquired Subsidiary are held of record by IndyMac Federal.

Section 7.03    Asset-Level Statements.    The Seller hereby makes the following statements with respect to the Servicing Rights as of the Closing Date:

(a)     Mortgage Loan Schedule.   As of the Initial Calculation Date, the information set forth in the information fields numbered one (1) through ten (10) inclusive in the Mortgage Loan Schedule is true and correct in all material respects.

(b)     Compliance with Applicable Laws.   Each Mortgage Loan was originated in compliance with those requirements of Laws applicable to the originator or servicer, as the case may be, that, if violated, would render the Mortgage Loan void, voidable, subject to a right of rescission or unenforceable. Each Mortgage Loan was serviced in material compliance with the requirements of Laws applicable to the servicer.

28

(c)     Ownership/Good Title.  The Seller is the sole owner of the Servicing Rights.  The Seller has good and marketable title thereto, and will transfer and sell its rights, title and interest in and to the Servicing Rights to the Purchaser free and clear of any Lien.

(d)     Escrow Accounts; Escrow Payments.  The information provided to the Purchaser as of the Initial Calculation Date with respect to Escrow Accounts and Escrow Payments in connection with the Mortgage Loans is true and correct in all material respects.

(e)     Servicing.  Each Mortgage Loan has been serviced in material compliance with the terms of the related Mortgage and Mortgage Note or the related Servicing Agreement, as applicable; provided that, the Seller makes no statement that the servicer thereof has complied with any obligation relating to the enforcement or notification of any rights against, or obligations of, the related depositor or seller of such Mortgage Loans to any investor (including into any securitization trust or other vehicle).

(f)     Servicing Agreements.  Each Servicing Agreement relating to the Mortgage Loans serviced for others as of the Initial Calculation Date is set forth on Schedule 7.03(f), and a copy of each such Servicing Agreement has been made available to the Purchaser.

(g)     Agency Approvals.  With respect to each Mortgage Loan serviced for any Agency, the Seller has procured all requisite consents and approvals of the related Agency to the transfer of the related Servicing Rights to the Purchaser.

## ARTICLE VIII

## REMEDIES FOR DEFECTIVE ASSETS

Section 8.01     Remedy.  In the event a Defect is discovered with respect to any Servicing Right (a "**Defective Asset**"), then, subject to the terms and conditions of this Article VIII, the Seller shall: (i) if the Seller determines that the Defect is curable using commercially reasonable means, either cure the Defect (which may include, among other things, a purchase price adjustment) or require the Purchaser to cure the Defect and then reimburse the Purchaser for reasonable amounts paid by the Purchaser to third parties to effect such cure, and (ii) reimburse the Purchaser for Losses incurred as a result of the Defect and, in the event of a Third Party Claim, reimburse the Purchaser and its officers, directors, employees, partners, principals, Affiliates, agents and contractors (collectively with the Purchaser, the "**Reimbursed Parties**") for Losses incurred as a result of such Third Party Claim (each, a "**Remedy**").  IN NO EVENT SHALL ANY DEFECT OR THE OBLIGATION TO PROVIDE A REMEDY HEREUNDER WITH RESPECT TO A DEFECTIVE ASSET BE EVIDENCE OF ANY BAD FAITH, MISCONDUCT OR FRAUD ON THE PART OF THE SELLER, THE FAILED THRIFT OR THE FDIC  EVEN IF IT IS SHOWN THAT THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY AFFILIATE THEREOF, OR ANY OF THEIR RESPECTIVE DIRECTORS, EMPLOYEES, OFFICERS, CONTRACTORS OR AGENTS, (A) KNEW OR SHOULD HAVE KNOWN OF THE EXISTENCE OF ANY FACTS RELATING TO SUCH DEFECT, (B) CAUSED SUCH DEFECT OR (C) FAILED TO MITIGATE SUCH DEFECT OR ANY OF THE LOSSES RESULTING THEREFROM.

Section 8.02    Conditions Precedent to Remedy.  The obligation of the Seller to provide a Remedy for any Defective Asset is contingent upon the satisfaction (as determined by the Seller in its sole discretion) or waiver (which may be granted by the Seller in its sole discretion) of each of the following conditions:

(a)    the Purchaser has delivered the Defect Notice and any supporting evidence required by Section 8.05 to the Seller on or prior to the Claims Termination Date, and has provided the Seller with all additional supporting evidence requested by the Seller pursuant to, and within the timeframe set forth in, Section 8.05;

(b)    the Purchaser has delivered the notice required by Section 8.04(a) to the Seller, if applicable;

(c)    neither the Purchaser nor the Purchaser's servicer has caused or materially exacerbated the Defect or increased any resulting Loss;

(d)    neither the Purchaser nor the Purchaser's servicer has taken any action or omitted to take any action (other than as required by Section 8.02(e)) that (x) materially and adversely affects the Seller's ability to process the request for, or provide, a Remedy, or (y) materially and adversely affects the ability or increases the cost to cure the Defect, or the Seller's ability to mitigate Losses, or otherwise results in a Loss (including any Excluded Loss) to the Seller;

(e)    in connection with the Defective Asset, the Purchaser or the Purchaser's servicer has complied in all material respects with the Guidelines, if applicable; and

(f)    the Purchaser has taken such additional actions that the Seller may have reasonably requested in order to mitigate Losses.

Section 8.03    Excluded Losses.  Losses that are reimbursable by the Seller hereunder shall not include any of the following:

(a)    Excluded Losses, unless such Losses are incurred by a Reimbursed Party as a direct result of a final, nonappealable order of a court of competent jurisdiction awarding damages in connection with a Third Party Claim asserted against such Reimbursed Party that would otherwise constitute Excluded Losses;

(b)    Losses arising from or in connection with claims asserted against the Purchaser by any of its Affiliates or any of its or their respective officers, directors, partners, employees, agents, creditors or stockholders (beneficial or of record);

(c)    Losses attributable to or arising from overhead allocations or general internal and administrative costs or the costs of administering or complying with the pre-approval, submission or reporting requirements imposed by or under this Agreement (such as but not limited to in-house counsel costs);

(d)    Losses reimbursable or payable by any Person (other than the Seller), including but not limited to recovery in the form of insurance proceeds; provided, however, that nothing contained herein shall require the Purchaser to pursue potential claims against prior servicers or

30

originators even if the successful pursuit of such claims could reduce the Seller's reimbursement obligation hereunder; or

(e)     litigation costs (including attorneys' fees and expenses) arising from or with respect to any bankruptcy action or foreclosure with respect to any Mortgage Loan.

Section 8.04     Third Party Claims.

(a)     In connection with any Third Party Claim for which any Reimbursed Party may seek reimbursement of Losses, the Purchaser shall deliver notice thereof to the Seller promptly after receipt by the Reimbursed Party of written notice of the Third Party Claim (but in any event no later than ten (10) Business Days after receipt of such written notice), describing in reasonable detail the facts giving rise to any claim for reimbursement hereunder, the amount of such claim (if known) and such other information with respect thereto as is available to the Reimbursed Party and as the Seller may reasonably request. The notice required by this Section 8.04 shall be in addition to the notice required by Section 8.05 with respect to a Defect.

(b)     If the Seller confirms in writing to the Reimbursed Party within fifteen (15) days after receipt of a Third Party Claim that the Seller will reimburse the Reimbursed Party therefor, the Seller may elect to assume control over the compromise or defense of such Third Party Claim at the Seller's own expense and by the Seller's own counsel, which counsel must be reasonably satisfactory to the Reimbursed Party, provided that (x) the Reimbursed Party may, at its option and its own expense, employ counsel to assist in the handling (but not control the defense) of any Third Party Claim; (y) the Seller shall keep the Reimbursed Party advised of all material events with respect to any Third Party Claim; and (z) the Seller shall obtain the prior written approval of the Reimbursed Party before ceasing to defend against any Third Party Claim or entering into any settlement, adjustment or compromise of such Third Party Claim involving injunctive or similar equitable relief being imposed upon the Reimbursed Party or any of its Affiliates.

(c)     If the Seller elects not to assume control over the compromise or defense of such Third Party Claim, the Reimbursed Party, upon providing prior written notice to the Seller, may pay, compromise or defend against such asserted Third Party Claim (but the Seller shall nevertheless be required to pay all Losses incurred by the Reimbursed Party in connection with such defense, settlement or compromise).

(d)     In connection with any defense of a Third Party Claim (whether by the Seller or any Reimbursed Party), all of the parties hereto shall, and shall cause their respective Affiliates to, cooperate in the defense or prosecution thereof and to in good faith retain and furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested by a party hereto in connection therewith.

Section 8.05     Notice and Evidence of Defect. The Purchaser shall notify the Seller of each Defective Asset with respect to which the Purchaser seeks a Remedy under Section 8.01 promptly upon discovery of the Defect, but in any event no later than ten (10) Business Days after the last day of the month in which such discovery occurs; provided, however, that if a Reimbursed Party receives written notice of a Third Party Claim, the Purchaser shall notify the

31

Seller of the Defect that is the basis of such Third Party Claim within ten (10) Business Days after the Reimbursed Party receives notice of the Third Party Claim. Such notice (the "**Defect Notice**") shall be in writing on the Purchaser's letterhead and shall include the following information:

      (a)     the Purchaser's tax identification number and wire transfer instructions;

      (b)     the identification of the particular statement of the Seller in Section 7.03 of this Agreement that the Purchaser believes was untrue at the time such statement was made;

      (c)     evidence supporting the basis for requesting a Remedy and the satisfaction of the conditions precedent to the Seller's obligation to provide a Remedy or, if any conditions precedent have not been satisfied, a request for a waiver of such conditions precedent, including the reasons why the Purchaser believes such waiver should be granted;

      (d)     information regarding any commercially reasonable means of curing the Defect that are available to the Purchaser and the estimated cost of effecting any such cure; and

      (e)     a certification by the Purchaser that the Defect Notice is being submitted in good faith and is complete and accurate in all respects to the best of the Purchaser's knowledge.

Promptly upon request by the Seller, but in any event no later than ten (10) Business Days thereafter, the Purchaser shall supply the Seller with any additional evidence or information that the Seller may reasonably request.

      Section 8.06    Processing of the Remedy Request.

      (a)     Within a reasonable period of time following the receipt by the Seller of the Defect Notice and all additional information that the Seller may have requested pursuant to Section 8.05, the Seller will notify the Purchaser as to whether the request for a Remedy with respect to a Defective Asset has been accepted or rejected and, if accepted, the Remedy that the Seller expects to provide and the expected timing for such Remedy.

      (b)     If the Seller notifies the Purchaser that the Remedy will be a reimbursement to the Purchaser for amounts paid to third parties to cure the Defect and that the Purchaser's proposed means of curing the Defect and the Purchaser's estimated cost thereof is acceptable to the Seller, the Purchaser shall promptly effect such cure using the means specified in the Defect Notice and submit documentation to the Seller regarding the actual costs incurred; provided, however, that the Purchaser shall not, without the prior written consent of the Seller, incur any cost to cure the Defect that is materially in excess of the estimate set forth in the Defect Notice. If the Seller does not agree to the proposed cure and cost thereof specified in the Defect Notice, the Purchaser shall promptly effect such other commercially reasonable cure as may be directed in writing by the Seller, and the Seller shall reimburse the Purchaser for all costs of effecting such cure. Notwithstanding the foregoing, the Seller shall have no obligation to reimburse the Purchaser for any cure costs unless the Purchaser has demonstrated to the satisfaction of the Seller that such costs are not recoverable from the Mortgagor under the Defective Asset or from any other source. In addition, the Purchaser agrees that the reimbursement of cure costs by the Seller may be conditioned on the Seller's receipt of an undertaking by the Purchaser to repay such costs to the

Seller if such costs are recovered from any source at any time after payment thereof by the Seller to the Purchaser.

(c)     Subject to the terms and conditions of this Article VIII, and except as otherwise provide herein with respect to Third Party Claims, the Seller will use commercially reasonable efforts to provide the selected Remedy to the Purchaser within sixty (60) days after providing the above-referenced notice to the Purchaser or, if the Remedy is to reimburse the Purchaser for amounts paid to cure the Defect, within sixty (60) days after the Purchaser submits satisfactory documentation thereof to the Seller.

Section 8.07     Seller Loss Limit. The Seller's obligation to provide a Remedy hereunder in respect of Defective Assets shall cease at such time as the aggregate payments made by the Seller (including payments made by the Seller to third parties to cure Defects) under this Article VIII (including purchase price adjustments) equals or exceeds the aggregate purchase price of the Assets (after taking into account any adjustment in the purchase price due to prorations or set-off amounts) (the "**Loss Limit**"), and the Seller shall have no liability for the cost of any Remedy to the extent such cost exceeds the Loss Limit.  Notwithstanding the foregoing, if the Seller has confirmed to a Reimbursed Party that it will reimburse the Reimbursed Party for Losses incurred with respect to a Third Party Claim, then the Seller will reimburse all such Losses, regardless of the Loss Limit.

## ARTICLE IX

### CONDITIONS PRECEDENT TO CLOSING

Section 9.01     Conditions to Purchaser's Obligation. The obligation of the Purchaser to effect the Closing hereunder is subject to the satisfaction (or waiver by the Purchaser) of all of the conditions set forth in Section 14.01 of the Master Purchase Agreement (subject to the introductory paragraph of Article XIV of the Master Purchase Agreement).

Section 9.02     Conditions to Seller's Obligation. The obligation of the Seller to effect the Closing hereunder is subject to the satisfaction (or waiver by the Seller) of all of the conditions set forth in Section 14.02 of the Master Purchase Agreement (subject to the introductory paragraph of Article XIV of the Master Purchase Agreement).

## ARTICLE X

### POST-CLOSING COVENANTS

Section 10.01  Discharge of Liabilities. Following the Closing Date, the Purchaser agrees to discharge the Assumed Liabilities in accordance with their terms and applicable Law.

Section 10.02  Performance of Servicing. From and after the Closing Date, the Purchaser shall pay, perform and discharge (i) those liabilities and obligations expressly assumed by Purchaser under this Agreement relating to the Servicing Rights and the other Assets acquired hereunder, including those liabilities and obligations under the related Servicing Agreements, Mortgage Loan Documents and Ancillary Documents; and (ii) all rights, obligations and duties expressly assumed by the Purchaser under this Agreement with respect to the related Escrow

33

Payments as required by the Security Parties, the Servicing Agreements and Mortgage Loan Documents, all in accordance with the standard of care set forth in Section 10.03. Notwithstanding anything to the contrary herein, unless prohibited by Law or by contract, in the event a Defect is discovered with respect to any Servicing Right, the Purchaser shall continue to service such Mortgage Loan in accordance with this Section 10.02. The Purchaser agrees that it will service the Mortgage Loans in accordance with the Guidelines, as applicable. The Purchaser shall obtain and maintain all licenses necessary to perform all of its obligations hereunder with respect to the Assets and the Assumed Liabilities and shall comply with all state laws requiring licensing to the extent necessary to permit the servicing of the Mortgage Loans in accordance with the terms of this Agreement and the Servicing Agreements. In addition, the Purchaser shall take any and all actions as may be necessary or appropriate to remain a qualified servicer under each Servicing Agreement.

Section 10.03  Standard of Care.  With respect to the servicing of the Mortgage Loans (including the conduct of foreclosures and the management of the Mortgaged Property) and the collection of advances, the Purchaser shall (i) exercise the degree of care which is standard in the industry with respect to the servicing of similar loans (including the conduct of foreclosures and the management of property) and the collection of similar advances and claims and (ii) service such Mortgage Loans in strict accordance with applicable Law and regulations and in accordance with applicable Investor and Insurer requirements governing servicers and the provisions of the applicable Servicing Agreements.  In the event there is a conflict between any provision of this Agreement on the one hand, and any applicable Servicing Agreement and/or any Investor or Insurer requirements on the other hand, the latter shall govern the Purchaser's conduct.

Section 10.04  Mitigation of Losses.  Subject to the provisions of the remainder of this Section 10.04, the Purchaser shall use its reasonable best efforts at all times to minimize the Losses for which the Seller may be liable under this Agreement. Without limiting the foregoing, in carrying out its duty to mitigate Losses for which the Seller may be liable, subject to the provisions of the remainder of this Section 10.04, the Purchaser shall, as applicable, pursue any counterclaim, offset, insurance settlement or other claim which would be reasonably likely to result in a recovery that would reduce the Seller's liability under this Agreement, including making prompt and proper application for and diligently pursuing receipt of insurance proceeds. If, in the Purchaser's reasonable judgment, litigation would be reasonably likely to result in a recovery that would reduce the Seller's liability under this Agreement, the Purchaser shall give the Seller written notice at least twenty (20) calendar days prior to instituting any such litigation. If the Seller agrees that such litigation should be pursued, the Purchaser shall institute litigation with respect to such potentially receivable claims.  If the Seller does not consent to such litigation within such twenty (20) day period, no failure of the Purchaser to institute such litigation shall constitute a breach by the Purchaser of its duty to mitigate losses under this Section 10.04.  The Purchaser shall institute litigation with respect to, or assign to the Seller, any such claim if it is requested to do so by the Seller.  For the avoidance of doubt, costs incurred in connection with the foregoing efforts to minimize Losses shall constitute Losses for purposes of this Agreement.

Section 10.05  Reimbursement of Recoveries.  Within fifteen (15) Business Days after receipt, the Purchaser shall refund to the Seller the amounts of all recoveries received by the

Purchaser with respect to any claim for which the Purchaser has received reimbursement for Losses under this Agreement.

Section 10.06 <u>Reimbursement for Draws</u>. From and after the Closing Date, (i) the Purchaser will be obligated to fund all Draws as required under the terms of the agreements related to the Securitization Transactions included on <u>Schedule 1.01(b)</u>, and (ii) the Seller will be obligated to reimburse the Purchaser for such Draws, in each case as set forth in the term sheet attached hereto as <u>Exhibit C</u> and the more detailed definitive documentation executed pursuant thereto. For the avoidance of doubt, the obligations, terms and commitments set forth in the term sheet attached hereto as <u>Exhibit C</u> are binding obligations of the parties hereto as if they were set forth in full herein, notwithstanding any delay in executing or failure to execute more detailed definitive documentation as contemplated therein.

Section 10.07 <u>Tax Reporting</u>. The Purchaser shall prepare, report to the Internal Revenue Service and provide to Mortgagors, all in accordance with applicable Law, rules and regulations, any and all Tax information required to be provided with respect to the Mortgage Loans for the entire year in which the Closing Date occurs and thereafter.

Section 10.08 <u>Insured or Guaranteed Mortgage Loans</u>. In connection with the sale and transfer of the Servicing Rights pursuant to this Agreement, if any Mortgage Loans are insured or guaranteed by any department or agency of any governmental unit, federal, state or local, and such insurance or guaranty is not being specifically terminated by Seller, the Purchaser represents that the Purchaser has been approved by such agency and is an approved servicer. The Purchaser further assumes full responsibility for determining whether or not such insurance or guarantees are in full force and effect on the Closing Date, and with respect to those Mortgage Loans with respect to which any such insurance or guaranty is in full force and effect on the Closing Date, the Purchaser assumes full responsibility for doing all things necessary to insure such insurance or guarantees remain in full force and effect. The Purchaser agrees to assume all of the Seller's obligations under the contracts of insurance or guaranty, agrees to indemnify and hold the Seller harmless from and against any claims of breach thereof after the Closing and agrees to cooperate with the Seller where necessary to complete forms required by the insuring or guaranteeing department or agency to effect or complete the transfer to the Purchaser.

Section 10.09 <u>Notice of Claim</u>. Each party hereto shall promptly notify the other party of any claim, threatened claim or litigation against the Failed Thrift, the Seller, the Purchaser or any of their respective employees, officers, agents and representatives arising out of or in any way related to any Mortgage Loan or Servicing Rights purchased by the Purchaser that may come to its attention.

Section 10.10 <u>Prior Servicer Information</u>. The Purchaser acknowledges and agrees that the Seller might not have access to information from prior servicers of a Mortgage Loan and that the Seller has not requested any information not in the possession of the Seller or its servicing contractor from any prior servicer of a Mortgage Loan. The Purchaser acknowledges and agrees that the Seller will not be required under the terms of this Agreement to request any information from any prior servicer.

Section 10.11   Further Assurances; Post-Closing Cooperation.

      (a)    At any time or from time to time after the Closing, the Seller shall execute and deliver or cause to be executed and delivered to the Purchaser such other documents and instruments, provide such materials and information and take such other actions as the Purchaser may reasonably request in order to effect the transfer, as provided in this Agreement, of the Assets and the Assumed Liabilities to the Purchaser and, to the full extent permitted by Law, to put the Purchaser in actual possession of the same.

      (b)    At any time or from time to time after the Closing, the Purchaser shall execute and deliver or cause to be executed and delivered to the Seller such other documents and instruments, provide such materials and information and take such other actions as the Seller may reasonably request in order to effect the transfer, as provided in this Agreement, of the Assets to the Purchaser and the assumption by the Purchaser of the Assumed Liabilities, and otherwise to cause the Purchaser to fulfill its obligations under this Agreement and the Ancillary Documents.

      (c)    If, in order to properly prepare its Tax Returns, other documents or reports required to be filed with Governmental Authorities or its financial statements or to fulfill its obligations hereunder, it is necessary that the Purchaser be furnished with additional information, documents or records relating to the Seller, and such information, documents or records are in the possession or control of the Seller, the Seller shall use commercially reasonable efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's request, cost and expense.

      (d)    Notwithstanding anything to the contrary contained in this Section 10.11, if the parties are in an adversarial relationship in litigation or arbitration, the furnishing of information, documents or records in accordance with any provision of this Agreement shall be subject to applicable rules relating to discovery.

      Section 10.12   Loan Modification Program.   The Purchaser shall complete the processing of all Mortgage Loan modifications in process pursuant to the Program as of the Closing Date and will honor all offers of modifications for which processing has not yet commenced in accordance with the terms of the Program. In addition, the Purchaser agrees that it will comply with the Program for so long as any financing provided by the Seller in connection with the purchase of the Servicing Rights remains outstanding. The Purchaser agrees that it will comply with the Program as it may be amended by the FDIC from time to time, provided, however, that, unless otherwise required by Law, the Purchaser shall not be required to comply with any changes to the Program after the Closing Date if such changes would (i) require the Purchaser to take any action in violation of applicable Law or the terms of any Servicing Agreement then in effect or (ii) result in the net present value of the estimated cash flows on the related Loan, discounted at the Then-Current Interest Rate, after any such change being less than the net present value of such Loan prior to such change. The Purchaser acknowledges and agrees that it will be required to comply with reporting requirements with respect to the Program that are acceptable to the FDIC in order to allow the FDIC to monitor compliance with, and the results of, the Program.

Section 10.13  Information and Access for Bond Insurers.  For each Securitization Transaction with respect to which there is a bond or similar insurer, the Purchaser shall provide to such insurer (x) such annual, quarterly and other financial reports and data and such annual certifications and (y) such access to information and personnel and notice of material events, in each case, as the Purchaser is required to provide to such insurer in accordance with the applicable Servicing Agreement or, if not so required, to the same extent as the Purchaser otherwise is required to provide to the trustee with respect to such Securitization Transaction. Prior to the Closing Date the Seller shall deliver to the Purchaser a list setting forth the name, contact information and Securitization Transactions for each such insurer to the extent known to the Seller.

## ARTICLE XI

### TAX MATTERS

Section 11.01  Responsibility for Filing Tax Returns.  The Seller shall timely prepare or cause to be prepared and file or cause to be filed, all Tax Returns with respect to the Acquired Subsidiary that are (i) required to be filed on or before the Closing Date; or (ii) filed on consolidated, unitary or combined basis with the Seller or any of its Affiliates. The Purchaser shall prepare or cause to be prepared and file or cause to be filed all other Tax Returns for the Acquired Subsidiary that are required to be filed after the Closing Date. The Purchaser shall permit the Seller to review and comment on such Tax Returns described in the preceding sentence prior to filing and shall make such revisions to such Tax Returns as are reasonably requested by the Seller. In accordance with Section 17.02 of the Master Purchase Agreement, the Seller shall pay to the Purchaser an amount equal to the portion of the Taxes shown on such Tax Returns that are attributable to the Tax periods or portions thereof ending on or before the Closing Date (pursuant to the allocation method described in Section 17.02 of the Master Purchase Agreement) but only to the extent that such Taxes were not paid by the Acquired Subsidiary prior to the Closing Date.

Section 11.02  Refund and Tax Benefits.  Any Tax refunds that are received by the Purchaser or the Acquired Subsidiary, and any amounts credited against Taxes to which the Purchaser or the Acquired Subsidiary become entitled, in each case that related to Tax periods or portions thereof of the Acquired Subsidiary ending on or before the Closing Date shall be for the account of the Seller, and the Purchaser shall pay over to the Seller any such refund or the amount of any such credit within fifteen (15) days after receipt or entitlement thereto.

Section 11.03  Cooperation on Tax Matters.

(a)     The Purchaser, the Acquired Subsidiary and the Seller shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to this Article XI and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Acquired Subsidiary and the Seller agree (A) to retain all Books and Records with respect to Tax matters

pertinent to Acquired Subsidiary relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations and any litigation holds (and, to the extent notified by Purchaser or Seller, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, the Acquired Subsidiary or the Seller, as the case may be, shall allow the other Party to take possession of such books and records.

(b)     The Purchaser and the Seller further agree, upon request, to use their best efforts to obtain any certificate or other document from any governmental authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

(c)     The Purchaser and the Seller further agree, upon request, to provide the other Party with all information that either Party may be required to report pursuant to Code Section 6043, Code Section 6043A, or Treasury Regulations promulgated thereunder.

Section 11.04  Tax-Sharing Agreements.     All tax-sharing agreements or similar agreements with respect to or involving the Acquired Subsidiary shall be terminated as of the Closing Date and, after the Closing Date, the Acquired Subsidiary shall not be bound thereby or have any liability thereunder.

## ARTICLE XII

## NOTICES

All notices, requests, demands and other communications required or permitted to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be given by certified or registered mail, postage prepaid, or delivered by hand or by nationally recognized air courier service, directed to the address of such Person set forth below:

| if to the Purchaser, to: | 888 East Walnut Street |
| | Pasadena, CA 91101-7211 |
| | Attention: Steven Mnuchin |

| with a copy to: | Cleary Gottlieb Steen & Hamilton LLP |
| | One Liberty Plaza |
| | New York, NY 10006 |
| | Attention: Paul E. Glotzer |

| if to the Seller, to: | Manager, Structured Transactions |
| | c/o Federal Deposit Insurance Corporation |
| | 550 17th Street, NW (Room F-7008) |
| | Washington, D.C. 20429-0002 |
| | Attention: George Alexander |

with a copy to:  Senior Counsel
FDIC Legal Division
Litigation and Resolutions Branch, Receivership Section
Special Issues Unit
3501 Fairfax Drive (Room E-7056)
Arlington, Virginia 22226
Attention: David Gearin

Any such notice shall become effective when received (or receipt is refused) by the addressee, provided that any notice or communication that is received (or refused) other than during regular business hours of the recipient shall be deemed to have been given at the opening of business on the next Business Day of the recipient. From time to time, any Person may designate a new address for purposes of notice hereunder by notice to such effect to the other Persons identified above.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

Section 13.01 Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall be ineffective, but such ineffectiveness shall be limited as follows: (i) if such provision is prohibited or unenforceable in such jurisdiction only as to a particular Person or Persons and/or under any particular circumstance or circumstances, such provision shall be ineffective, but only in such jurisdiction and only with respect to such particular Person or Persons and/or under such particular circumstance or circumstances, as the case may be; (ii) without limitation of clause (i), such provision shall in any event be ineffective only as to such jurisdiction and only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction; and (iii) without limitation of clauses (i) or (ii), such ineffectiveness shall not invalidate any of the remaining provisions of this Agreement. Without limitation of the preceding sentence, it is the intent of the parties to this Agreement that in the event that in any court proceeding, such court determines that any provision of this Agreement is prohibited or unenforceable in any jurisdiction (because of the duration or scope (geographic or otherwise) of such provision, or for any other reason) such court shall have the power to, and shall, (x) modify such provision (including without limitation, to the extent applicable, by limiting the duration or scope of such provision and/or the Persons against whom, and/or the circumstances under which, such provision shall be effective in such jurisdiction) for purposes of such proceeding to the minimum extent necessary so that such provision, as so modified, may then be enforced in such proceeding and (y) enforce such provision, as so modified pursuant to clause (x), in such proceeding. Nothing in this Section is intended to, or shall, limit (1) the ability of any party to this Agreement to appeal any court ruling or the effect of any favorable ruling on appeal or (2) the intended effect of Section 13.02.

Section 13.02 Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL LAW, BUT IF FEDERAL LAW DOES NOT PROVIDE A RULE OF DECISION IT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER

THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION). Nothing in this Agreement shall require any unlawful action or inaction by any party hereto.

Section 13.03   Waivers; Amendment and Assignment.   No provision of this Agreement may be amended or waived except in writing executed by all of the parties to this Agreement. This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors and permitted assigns, and no other Person or Persons (including Mortgagors or any co-lender or other Person with any interest in or liability under any of the Mortgage Loans) shall have any rights or remedies under or by reason of this Agreement. Notwithstanding the foregoing, this Agreement may not be transferred or assigned without the express prior written consent of the Seller and any attempted assignment without such consent shall be void *ab initio*.

Section 13.04   No Presumption.   This Agreement shall be construed fairly as to each party hereto and if at any time any such term or condition is desired or required to be interpreted or construed, no consideration shall be given to the issue of who actually prepared, drafted or requested any term or condition of this Agreement or any agreement or instrument subject hereto.

Section 13.05   Entire Agreement.   This Agreement and the Ancillary Documents contain the entire agreement between the Seller and the Purchaser and/or its Affiliates with respect to the subject matter hereof and supersede any and all other prior agreements, whether oral or written. In the event of a conflict between the terms of this Agreement and the terms of any Transfer Document or other document or instrument executed in connection herewith or in connection with the transactions contemplated hereby, including any translation into a foreign language of this Agreement for the purpose of any Transfer Document, or any other document or instrument executed in connection herewith which is prepared for notarization, filing or any other purpose, the terms of this Agreement shall control, and furthermore, the terms of this Agreement shall in no way be or be deemed to be amended, modified or otherwise affected in any manner by the terms of such Transfer Document or other document or instrument.

Section 13.06   Jurisdiction; Venue and Service.   Each of the Purchaser, for itself and its Affiliates, and the Seller hereby irrevocably and unconditionally:

(a)       (i) agrees that any suit, action or proceeding instituted against it by any other party with respect to this Agreement may be instituted, and that any suit, action or proceeding by it against any other party with respect to this Agreement shall be instituted, only in the U.S. District Court for the Southern District of New York or the United States District Court for the District of Columbia (and appellate courts from any of the foregoing), (ii) consents and submits, for itself and its property, to the jurisdiction of such courts for the purpose of any such suit, action or proceeding instituted against it by any other party and (iii) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law;

40

(b)     agrees that service of all writs, process and summonses in any suit, action or proceeding pursuant to Section 13.06(a) may be effected by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address for notices pursuant to Article XII (with copies to such other Persons as specified therein); provided, however, that nothing contained in this Section 13.06 shall affect the ability of any party to be served process in any other manner permitted by Law;

(c)     (i) waives any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court specified in Section 13.06(a), (ii) waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and (iii) agrees not to plead or claim either of the foregoing; and

(d)     agrees that nothing contained in this Section 13.06 shall be construed as a limitation on any removal rights the FDIC may have.

Section 13.07   Waiver of Jury Trial. EACH OF THE PURCHASER, FOR ITSELF AND ITS    AFFILIATES,    AND    THE    SELLER    HEREBY    IRREVOCABLY    AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Section 13.08   Counterparts; Facsimile Signatures. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same agreement. This Agreement and any amendments hereto, to the extent signed and delivered by facsimile or other electronic means, shall be treated in all manner and respects as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No signatory to this Agreement shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such Person forever waives any such defense.

Section 13.09   Headings. Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof. All Section and paragraph references contained herein shall refer to Sections and paragraphs in this Agreement unless otherwise specified.

Section 13.10   Compliance with Law. Except as otherwise specifically provided herein, each party to this Agreement shall, at its own cost and expense, obey and comply with all applicable Laws, as they may pertain to such party's performance of its obligations hereunder.

Section 13.11   Right to Specific Performance.     THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT THE DAMAGES TO BE INCURRED BY THE SELLER AS A RESULT OF THE PURCHASER'S BREACH OF THIS AGREEMENT WILL

BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN, THAT DAMAGES WILL NOT BE AN ADEQUATE REMEDY AND THAT ANY BREACH OR THREATENED BREACH OF ANY OF THE PROVISIONS OF THIS AGREEMENT BY THE PURCHASER MAY CAUSE IMMEDIATE IRREPARABLE HARM FOR WHICH THERE MAY BE NO ADEQUATE REMEDY AT LAW. ACCORDINGLY, THE PARTIES AGREE THAT, IN THE EVENT OF ANY SUCH BREACH OR THREATENED BREACH, THE SELLER SHALL BE ENTITLED TO IMMEDIATE AND PERMANENT EQUITABLE RELIEF (INCLUDING INJUNCTIVE RELIEF AND SPECIFIC PERFORMANCE OF THE PROVISIONS OF THIS AGREEMENT) FROM A COURT OF COMPETENT JURISDICTION (IN ADDITION TO ANY OTHER REMEDY TO WHICH IT MAY BE ENTITLED AT LAW OR IN EQUITY). THE PARTIES AGREE AND STIPULATE THAT THE SELLER SHALL BE ENTITLED TO EQUITABLE (INCLUDING INJUNCTIVE) RELIEF WITHOUT POSTING A BOND OR OTHER SECURITY AND THE PURCHASER FURTHER WAIVES ANY DEFENSE IN ANY SUCH ACTION FOR SPECIFIC PERFORMANCE OR INJUNCTIVE RELIEF THAT A REMEDY AT LAW WOULD BE ADEQUATE AND ANY REQUIREMENT UNDER LAW TO POST SECURITY AS A PREREQUISITE TO OBTAINING EQUITABLE RELIEF.  NOTHING CONTAINED IN THIS SECTION SHALL LIMIT ANY PARTY'S RIGHT TO ANY REMEDIES AT LAW, INCLUDING THE RECOVERY OF DAMAGES FOR BREACH OF THIS AGREEMENT.

Section 13.12  No Third Party Beneficiaries.  This Agreement is made for the sole benefit of the Seller and the Purchaser and their respective successors and permitted assigns, and no other Person or Persons (including any Mortgagor or co-lender or other Person with any interest in or liability under any of the Mortgage Loans) shall have any rights or remedies under or by reason of this Agreement. Notwithstanding the foregoing, the FDIC shall be considered a third party beneficiary of this Agreement.

Section 13.13  Timing.  The Purchaser agrees that, although the Seller has agreed to use commercially reasonable efforts to take certain actions pursuant to this Agreement within specified periods of time, the failure of the Seller to take any such actions within such specified periods shall not be dispositive evidence of a breach by the Seller of this Agreement.

Section 13.14  Survival.    The covenants, representations and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder, unless otherwise contemplated herein.

Section 13.15  Termination.  This Agreement shall terminate upon the termination of the Master Purchase Agreement in accordance with its terms.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Servicing Business Asset Purchase Agreement to be executed as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _George C. Ahyal_

Name: George C. Alevander
Title: Manager, Structured Transactions

ONEWEST BANK, FSB

By: _____

Name: Joshua P. Eaton
Title: Authorized Signatory

Servicing Rights Asset Purchase Agreement

**IN WITNESS WHEREOF,** the parties hereto have caused this Servicing Business Asset Purchase Agreement to be executed as of the day and year first above written.

> FEDERAL DEPOSIT INSURANCE
> CORPORATION AS RECEIVER FOR
> INDYMAC FEDERAL BANK, FSB

By: _____
      Name:
      Title:

> ONEWEST BANK, FSB

By: _____
      Name: Joshua P. Eaton
      Title: Authorized Signatory

## EXHIBIT A

## AFFIDAVIT AND ASSIGNMENT OF CLAIM

### (For use with Loans in Bankruptcy)

*(Note to Preparer:  When preparing the actual Affidavit and Assignment, delete this instruction and the reference to Exhibit A  above.)*

State of _____ )
                                                )
County of _____ )

The undersigned, being first duly sworn, deposes and states as follows:

The Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB ("Assignor"), acting by and through its duly authorized officers and agents, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, transfer, assign and set over to [_____], a {insert type of entity} ("Assignee") and its successors and assigns, all of the Assignor's interest in any claim (including any and all proofs of claim filed by the Assignor with the Bankruptcy Court (as defined below) in respect of such claim) in the bankruptcy case commenced by or against {insert Obligor's name} ("Obligor") in the {insert (1) appropriate U. S. Bankruptcy Court, including the district of the court, such as for the Western District of Texas, or (2) the Foreign Jurisdiction Bankruptcy Court} ("Bankruptcy Court") being designated as Case Number {insert docket number assigned case} ("Bankruptcy Claim"), or such part of said Bankruptcy Claim as is based on the promissory note of {insert the names of the makers of the note exactly as they appear on the note}, dated {insert the date the note was made}, and made payable to {insert the name of the payee on the note exactly as it appears on the note}, provided, however, that this assignment is made pursuant to the terms and conditions as set forth in that certain Servicing Business Asset Purchase Agreement between the Assignor and the Assignee dated March 19, 2009 (the "Agreement").

For purposes of Rule 3001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule 3001"), this assignment and affidavit represent the unconditional transfer of the Bankruptcy Claim or such part of the Bankruptcy Claim as is based on the promissory note or notes described above and shall constitute the statement of the transferor acknowledging the transfer and stating the consideration therefor as required by said Bankruptcy Rule 3001. The Assignor hereby waives any objection to the transfer of the Bankruptcy Claim to the Assignee to the extent set forth above on the books and records of the Obligor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Bankruptcy Rule 3001, the Bankruptcy Code, applicable local bankruptcy rules or applicable law with respect to the Bankruptcy Claim to such extent. The Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to the Assignor transferring to the Assignee the Bankruptcy Claim to the extent set forth above and recognizing the Assignee as the sole owner and holder of the Bankruptcy Claim to such extent. The Assignor further notifies the Obligor, the Bankruptcy Court and all other

interested parties that all further notices relating to the Bankruptcy Claim to such extent, and all payments or distributions of money or property in respect of the Bankruptcy Claim to such extent, shall be delivered or made to the Assignee.

This transfer was not for the purpose of the enhancement of any claim in a pending bankruptcy. The transfer of the debt was pursuant to the Agreement, through which numerous debts were sold; no specific amount of the total consideration was assigned to the debt that forms the basis of claim.

This assignment shall also evidence the unconditional transfer of the Assignor's interest in any security held for the Bankruptcy Claim.

IN WITNESS WHEREOF, the Assignor has caused this Affidavit and Assignment of Claim to be executed this ___ day of _____, 20__.

> FEDERAL DEPOSIT INSURANCE
> CORPORATION AS RECEIVER
> FOR INDYMAC FEDERAL BANK, FSB
>
> By:_____
>     Name:
>     Title:   Attorney-in-Fact

ACKNOWLEDGMENT

STATE OF _____ )
                                                )
COUNTY OF _____ · )

Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared George Alexander, known to me to be the person whose name is subscribed to the foregoing instrument, as _____ of the Federal Deposit Insurance Corporation acting in the capacity stated above, and he acknowledged to me that he executed the same as the act of the Federal Deposit Insurance Corporation, for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office on this the ___ day of _____, 20__.

_____
Notary Public

[SEAL]                                        My Commission expires: _____

A-3

## EXHIBIT B

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** is made and entered into as of the ___ day of _____, 2009 by and between the FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB ("**Assignor**") and ONEWEST BANK, FSB ("**Assignee**").

**WHEREAS**, Assignor and Assignee have entered into that certain Servicing Business Asset Purchase Agreement, dated March 19, 2009 (the "**Sale Agreement**"), pursuant to which Assignor has agreed to sell, transfer and assign to Assignee certain mortgage servicing rights and other assets and Assignee has agreed to assume certain obligations:

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     Assignor's Assignment.  Assignor hereby transfers, grants, conveys and assigns to Assignee all of Assignor's right, title and interest in the Assets, including, without limitation, the Servicing Agreements.

2.     Assignee's Acceptance.  Assignee does hereby accept such assignment from Assignor and assumes all obligations arising from and after the date hereof.

3.     Excluded Assets.  Other than the Assumed Liabilities, Assignee is not assuming and shall not be liable for or bound by any liabilities of Assignor.  Nothing contained in this Agreement shall transfer or assign to Assignee any right to any of the Excluded Assets.

4.     Incorporation of terms of the Sales Agreement.  This Agreement is made, executed and delivered pursuant to the Sale Agreement, and is subject to all the terms, provisions and conditions thereof.  To the extent of any conflict between the terms of the Sale Agreement and this Agreement, the Sale Agreement shall be controlling.  Initially capitalized terms used and not defined herein have the meanings given them in the Sale Agreement.

5.     Beneficiaries of this Assignment.  This Assignment shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective successors and assigns, and the Federal Deposit Insurance Corporation in its corporate capacity shall be a third-party beneficiary with respect hereto.

6.     Controlling Law.  Federal law of the United States shall control this Agreement. To the extent that federal law does not supply a rule of decision, this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York. Nothing in this Agreement will require any unlawful action or inaction by either party.

7.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

**IN WITNESS WHEREOF**, each of the parties has caused this Assignment and Assumption Agreement to be executed and delivered by its duly authorized officer or agent as of the day and year first written above.

<div style="margin-left: 40%;">

**ASSIGNOR:**
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

</div>

_____          By: _____
WITNESS                            Name:
                                   Its:

<div style="margin-left: 40%;">

**ASSIGNEE:**
ONEWEST BANK, FSB

</div>

_____          By: _____
WITNESS                            Name:
                                   Its:

**EXHIBIT C**

**TERM SHEET FOR ASSIGNMENT OF FUNDING OBLIGATIONS TO SERVICER IN
HELOC SECURITIZATIONS AND REIMBURSEMENT FOR DRAWS**

SEE TAB 41.

**EXHIBIT D**

**FORM OF BILL OF SALE**

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the terms and conditions of the Servicing Business Asset Purchase Agreement by and between the FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB ("**Seller**"), and ONEWEST BANK, FSB ("**Purchaser**"), dated March 19, 2009 (the "**Agreement**"), the Seller does hereby bargain, sell, assign, transfer, set over and convey to the Purchaser, its successors and assigns, without recourse, all right, title and interest of the Seller in and to the Assets, as defined in the Agreement, including the Servicing Rights (as identified on Schedule 1.01(a) thereto), for all purposes, in accordance with Article II of the Agreement.

THIS BILL OF SALE IS EXECUTED AND DELIVERED WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, WHETHER EXPRESS, IMPLIED OR CREATED BY OPERATION OF LAW, EXCEPT AS PROVIDED IN THE AGREEMENT AND THE MASTER PURCHASE AGREEMENT.

Executed this _____ day of _____, 2009.

**SELLER:**
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By:_____

Name:_____

_____     Title:_____
WITNESS

D-1

ACKNOWLEDGMENT

STATE OF _____ )
                                         )
COUNTY OF _____ )

     Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared George Alexander, known to me to be the person whose name is subscribed to the foregoing instrument, as _____
of the Federal Deposit Insurance Corporation as Receiver of IndyMac Federal Bank, FSB, and he acknowledged to me that he executed the same as the act of the Federal Deposit Insurance Corporation, for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office on this the ___ day of _____, 2009.

                                          _____
                                          Notary Public

[SEAL]                          My Commission expires: _____

**EXHIBIT E**

**FORM OF LIMITED POWER OF ATTORNEY**

**[SALE NAME]**

*(Note to Preparer:  When preparing the actual Limited Power of Attorney, delete this instruction and the reference to Exhibit E above.)*

KNOW ALL PERSONS BY THESE PRESENTS, that the FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC") as Receiver for IndyMac Federal Bank, FSB, hereafter called the "Receiver", hereby designates the individual(s) set out below (the "Attorney(s)-in-Fact") for the sole purpose of executing the documents outlined below:

_____

_____

WHEREAS, the undersigned has full authority to execute this instrument on behalf of the FDIC as Receiver under applicable Resolutions of the FDIC's Board of Directors and redelegations thereof.

NOW THEREFORE, the FDIC as Receiver grants to the above-named Attorney(s)-in-Fact the authority, subject to the limitations herein, as follows:

1.      To execute, acknowledge, seal and deliver on behalf of the FDIC as Receiver for IndyMac Federal Bank, FSB all instruments of transfer and conveyance, appropriately completed, with all ordinary or necessary endorsements, acknowledgments, affidavits and supporting documents as may be necessary or appropriate to evidence the sale and transfer of any asset pursuant to that certain Servicing Business Asset Purchase Agreement, dated as of March 19, 2009, between the Receiver and OneWest Bank, FSB.

The form which the Attorney(s)-in-Fact shall use for endorsing promissory notes or preparing allonges to promissory notes is as follows:

> Pay to the order of
> OneWest Bank, FSB
> Without Recourse
>
> FEDERAL DEPOSIT INSURANCE
> CORPORATION as Receiver for IndyMac Federal
> Bank, FSB
>
> By: _____
>
>    Name: _____
>
>    Title:      Attorney-in-Fact

All other documents of assignment, conveyance or transfer shall contain this sentence: "This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in its corporate capacity or as Receiver."

2.      To grant to each Attorney-in-Fact full power and authority to do and perform all acts necessary to carry into effect the powers granted by this Limited Power of Attorney as fully as FDIC or the Receiver might or could do with the same validity as if all and every such act had been herein particularly stated, expressed and especially provided for.

This Limited Power of Attorney shall be effective from _____, 2009 and shall continue in full force and effect through _____, 2010 unless otherwise terminated by an official of the FDIC authorized to do so by the Board of Directors ("Revocation"). At such time this Limited Power of Attorney will be automatically revoked. Any third party may rely upon this document as the named individual(s)' authority to continue to exercise the powers herein granted unless a Revocation has been recorded in the public records of the jurisdiction where this Limited Power of Attorney has been recorded, or unless a third party has received actual notice of a Revocation.

IN WITNESS WHEREOF, the FDIC by its duly authorized officer empowered by appropriate resolution of its Board of Directors, has caused these presents to be executed and subscribed in its name this ___ day of _____, 2009.

**FEDERAL DEPOSIT INSURANCE CORPORATION as**
**Receiver for IndyMac Federal Bank, FSB**

By: _____
        Name: _____
        Title: _____

**[CONTINUED ON NEXT PAGE]**

(CORPORATE SEAL)       ATTEST:_____

                               Name:  Herbert J. Messite
                               Title:  Counsel

Signed, sealed and delivered
in the presence of

By:_____
Name:_____
      Witness

By:_____
Name:_____
      Witness

**[ACKNOWLEDGMENT ON NEXT PAGE]**

**ACKNOWLEDGMENT**

UNITED STATES OF AMERICA   )
                           )
DISTRICT OF COLUMBIA       )

On this ___ day of _____, 2009, before me, Notary Public in and for the District of Columbia, personally appeared _____ and Herbert J. Messite, with a business address of 550 17th Street, NW, Washington, DC  20429, who, being duly sworn, severally depose and say:

First, _____, first affiant, for himself, says that he is _____ of the Federal Deposit Insurance Corporation, the Corporation in whose name the foregoing Limited Power of Attorney has been subscribed, that the said Limited Power of Attorney was subscribed on behalf of the said Corporation by due authority of the Corporation's Board of Directors, and that the said _____ acknowledges that said Limited Power of Attorney to be the free act and deed of the said Corporation.

Second, Herbert J. Messite, second affiant, for himself, says that he is a Counsel with the Federal Deposit Insurance Corporation, the Corporation in whose name the foregoing Limited Power of Attorney has been subscribed, that the seal affixed to the said Limited Power of Attorney is the corporate seal of the said Federal Deposit Insurance Corporation, that the said Limited Power of Attorney was subscribed on behalf of the said Corporation and its seal thereto affixed by due authority of the Corporation's Board of Directors, and that the said Herbert J. Messite acknowledged the said Limited Power of Attorney to be the free act and deed of the said Corporation.

_____
**Notary Public, District of Columbia**
**United States of America**

**My Commission Expires:**

_____

E-4

**EXHIBIT F**

**FDIC MORTGAGE LOAN MODIFICATION PROGRAM**

Objective

The objective of this FDIC Mortgage Loan Modification Program ("Program") is to modify the terms of certain residential mortgage loans so as to improve affordability, increase the probability of performance, allow borrowers to remain in their homes and increase the value of the loans to the FDIC and assignees.  The Program provides for the modification of Qualifying Loans (as defined below) by reducing the borrower's monthly housing debt to income ratio ("DTI Ratio") to a target of 28%, never to exceed 38%, at the time of the modification and eliminating adjustable interest rate and negative amortization features.

Qualifying Mortgage Loans

In order for a mortgage loan to be a Qualifying Loan it must meet all of the following criteria, which must be confirmed by the lender:

- The collateral securing the mortgage loan is owner-occupied; and

- The mortgagor has a first priority lien on the collateral; and

- Either the borrower is at least 60 days delinquent or a default is reasonably foreseeable.

Modification Process

The lender shall undertake a review of its mortgage loan portfolio to identify Qualifying Loans. For each Qualifying Mortgage Loan, the lender shall determine the net present value ("NPV") of the modified loan and, if it will exceed the NPV of the foreclosed collateral upon disposition, then the Qualifying Loan shall be modified so as to reduce the borrower's monthly DTI Ratio to 28% (or to the lowest DTI Ratio higher than 28%, but not to exceed 38%, resulting in a NPV exceeding the foreclosed collateral upon disposition) at the time of the modification.  To achieve this, the lender shall use a combination of interest rate reduction, term extension and principal forbearance, as necessary.

The borrower's monthly DTI Ratio shall be a percentage calculated by dividing the borrower's monthly housing payment (including principal, interest, taxes and insurance) by the borrower's monthly income.  For these purposes, (1) the borrower's monthly income shall be the amount of the borrower's (along with any co-borrowers') documented and verified gross monthly income, and (2) the borrower's monthly housing payment shall be the amount required to pay monthly principal and interest plus one-twelfth of the then current annual amount required to pay real property taxes and homeowner's insurance with respect to the collateral.

In order to calculate the monthly principal payment, the lender shall capitalize to the outstanding principal balance of the Qualifying Loan the amount of all delinquent interest, delinquent taxes,

past due insurance premiums, third party fees and (without duplication) escrow advances (such amount, the "Capitalized Balance").

In order to achieve the goal of reducing the DTI Ratio to 28%, the lender shall take the following steps in the following order of priority with respect to each Qualifying Loan:

1.    Reduce the interest rate to the then current Freddie Mac Survey Rate for 30-year fixed rate mortgage loans, and adjust the term to 30 years.

2.    If the DTI Ratio is still in excess of 28%, reduce the interest rate further, but no lower than 3%, until the DTI ratio of 28% is achieved.

3.    If the DTI Ratio is still in excess of 28% after adjusting the interest rate to 3%, extend the remaining term of the loan by 10 years.

4.    If the DTI Ratio is still in excess of 28%, calculate a new monthly payment (the "Adjusted Payment Amount") that will result in the borrower's monthly DTI Ratio not exceeding 28%. After calculating the Adjusted Payment Amount, the lender shall bifurcate the Capitalized Balance into two portions – the amortizing portion and the non-amortizing portion. The amortizing portion of the Capitalized Balance shall be the mortgage amount that will fully amortize over a 40-year term at an annual interest rate of 3% and monthly payments equal to the Adjusted Payment Amount. The non-amortizing portion of the Capitalized Balance shall be the difference between the Capitalized Balance and the amortizing portion of the Capitalized Balance. The lender shall forbear on collecting the non-amortizing portion of the Capitalized Balance, and such amount shall be due and payable only upon the earlier of (i) maturity of the modified loan, (ii) a sale of the property or (iii) a pay-off or refinancing of the loan. No interest shall be charged on the non-amortizing portion of the Capitalized Balance, but repayment shall be secured by a first lien on the collateral.

5.    If, under any of the above steps, the NPV of a modification falls short of the NPV of the foreclosed collateral upon disposition, the DTI may be increased to the minimum level where the NPV of the modification exceeds the NPV of the foreclosed collateral upon disposition. However, under no circumstances will the DTI for the modification exceed 38%.

At the end of the five (5) year period, the interest rate on the modified loan shall adjust to the Freddie Mac Survey Rate as of the date of the loan modification, but subject to an annual adjustment cap of one percent (1%) per year. At that time, the monthly amount due by the borrower will also adjust to amortize fully the remaining Capitalized Balance (or, in any case in which the Capitalized Balance was bifurcated, the amortizing portion thereof) over the remaining term of the modified loan.

Additional Modification Terms

In connection with the modification of any Qualifying Loan, the following additional requirements shall apply.

1.    The lender shall not charge (and no borrower shall be required to pay) any modification, refinance or other similar fees or points in connection with the modification, nor shall any such fees, costs or charges be capitalized.

2.    Unpaid late fees and prepayment penalties otherwise chargeable to the borrower shall be waived.

3.    Modified loans shall not include any prepayment penalties.

4.    With respect to all loan modifications commenced after September 19, 2009, the lender shall establish an escrow account for the payment of future taxes and insurance premiums. To the extent that the lender has the processes and procedures in place to establish the escrow accounts for modified loans prior to September 19, 2009, the lender will establish such accounts at such earlier date.

Related Junior Lien Mortgage Loans

In cases where the lender holds a junior lien mortgage loan that is collateralized by the same property that collateralizes a Qualifying Loan that is modified as described above, the junior lien mortgage loan shall also be modified to enhance overall affordability to the borrower. At a minimum, the lender shall reduce the interest rate on the junior lien mortgage loan to no more than 2% per annum. Further modifications may be made at the lender's discretion as needed to support affordability and performance of the modified first lien Qualifying Loan.

Amendments

The Program may be modified either (i) by the FDIC, upon written notice to the lender of such modification, or (ii) as proposed by the lender with respect to a group of loans with similar characteristics, if approved in writing by the FDIC.

F-3

**EXHIBIT G**

**FORM OF AFFIDAVIT OF LOST STOCK CERTIFICATE**

The Federal Deposit Insurance Corporation ("FDIC") as Receiver for IndyMac Federal Bank, FSB (the "Receiver") hereby attests, agrees, represents and covenants as follows:

1.      The Receiver is the sole shareholder and legal and beneficial owner of 2,000 shares of capital stock, par value $1.00 per share (the "Shares"), of IndyMac Financial Services, a California corporation (the "Company"). The Receiver obtained its interest in the Company on July 11, 2008, under an Insured Deposit Purchase and Assumption Agreement with the FDIC as Receiver of IndyMac Bank, FSB.

2.      Neither the Shares nor any of the rights of the Receiver therein have been assigned, transferred, hypothecated, pledged or otherwise disposed of in any manner whatsoever, either in whole or in part, and to the knowledge of the Receiver, no claim of right, title or interest adverse to the Receiver in or to the Shares or any interest therein has been made or advanced by any person.

3.      The Receiver is entitled to full and exclusive possession of the Shares.

4.      The stock certificate for the Shares (the "Certificate") has been lost, mislaid or destroyed and is not in the possession of the Receiver and cannot now be produced.

5.      The Receiver has made, or caused to be made, a diligent search for the Certificate and has been unable to find or recover such Certificate.

6.      The Receiver hereby agrees immediately to surrender the Certificate to the Company for cancellation should it at any time hereafter come into the hands, custody or power of the Receiver without receiving any consideration therefor.

7.      The Receiver hereby requests and instructs the Company to (i) refuse to recognize any person or entity other than OneWest Bank, FSB as the owner of the Certificate, (ii) transfer the record ownership of the Shares on the books of the Company and (iii) issue a new or duplicate certificate in substitution of the Certificate to OneWest Bank, FSB without the surrender of the Certificate for cancellation.

8.      The Receiver agrees to (i) release and forever discharge the Company, its legal representatives, successors and assigns from any and all liability relating to the loss of the Certificate and/or the Company's compliance with the instructions set forth herein and (ii) indemnify, hold harmless and protect the Company, its legal representatives, successors and assigns from any and all loss, damages, liability, cost and/or expense in connection with or in any way relating to or arising out of (x) the loss of the Certificate and/or the Company's compliance with the instructions set forth herein and (y) any breach or violation of any attestation, agreement, representation or covenant contained herein; provided, however, that the Receiver shall not have any obligation to indemnify the Company for any attorney's fees or other expenses incurred by the Company in connection with the issuance of a new certificate or the review and negotiation of this Affidavit of Lost Stock Certificate.

IN WITNESS WHEREOF, the undersigned has executed this Affidavit of Lost Stock Certificate this _____ day of March, 2009.

          **FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB**

          By:_____

               George Alexander
               Attorney-in-Fact

STATE OF NEW YORK
COUNTY OF NEW YORK

Subscribed and sworn to before me this _____ day of March, 2009

_____

Notary Public

[Seal]

## SCHEDULES

SEE SECTION II (GROUP 2), SCHEDULES TO SERVICING BUSINESS ASSET
PURCHASE AGREEMENT, ON THE SCHEDULES CD FOR THE FOLLOWING:

| | |
|---|---|
| Schedule 1.01(a) | Mortgage Loans |
| Schedule 1.01(b) | Servicing Agreement Transactions |
| Schedule 2.01(b) | Servicing Advances |
| Schedule 2.01(c) | Servicing Fee Receivables |
| Schedule 2.01(f) | Escrow Accounts |
| Schedule 2.03(c) | Assumed Litigation |
| Schedule 2.06 | Categories and Applicable Percentages with Respect to Servicing Rights |
| Schedule 7.03(f) | Servicing Agreements |